DAVIS-MIZE COMPANY, INC. v. GEORGE F. WELLER, JR.

Western Section.  March 13, 1931.

Petition for Certiorari denied by Supreme Court, June 10, 1931.

Wilson, Kyser, Armstrong & Allen, of Memphis, for plaintiff in error.

Lowell W. Taylor, of Memphis, for defendant in error.

OWEN, J. George F. Weller, Jr., hereinafter called plaintiff, recovered a judgment for $20,000 against Davis-Mize Company, a corporation hereinafter called defendant.

The suit was for damages for personal injuries sustained by the plaintiff as a result of a collision between the plaintiff's motorcycle and a truck operated by the defendants' servant, which truck was being operated in the interest of the defendant's business. The accident occurred at about 9:30 P. M. on the night of July 5, 1929, on Main Street in the city of Memphis.

The plaintiff was riding on a motorcycle, going south; Main Street runs in a northerly and southerly direction. He was on the west side of the street. The truck of the defendant was coming in a northerly direction, about the middle of Main Street, and plaintiff's insistence was that this truck suddenly turned to the left to enter a garage on the west side of Main Street, that the truck was being operated at an excessive speed, that the driver turned suddenly and without warning. By the driver's negligence and recklessness, the plaintiff's motorcycle was struck, he was thrown from the motorcycle and received serious injuries. Plaintiff sued for both punitive and compensation damages. The trial judge instructed the jury not to find as to punitive damages. The defendant submitted a number of special requests at the conclusion of the trial judge's charge to the jury, and each and every special request was granted and read to the jury. After the verdict was returned for $20,000, the defendant seasonably filed its motion for a new trial, which was overruled, prayed and perfected an appeal, and had signed and filed a proper bill of exceptions.

The defendant has assigned six errors. The first three errors complain of the Court admitting over the objection of the defendant the testimony of the witnesses, Jno. M. McGregor, H. C. Flemister and Elige Cannon. The last three errors complain of the verdict being excessive, that it is so grossly excessive as to indicate passion, prejudice or unaccountable caprice on the part of the jury. Thus is seen by these assignments of error that only two questions are raised on this appeal:

(1) The question of the testimony of the three witnesses admitted, and,

(2) The amount of the verdict.

It appears from the record that the plaintiff, at the time of the accident, was twenty-four years of age. He was engaged with his brother in operating an automobile accessory business, which is located at 459 Monroe Avenue, in the City of Memphis. The record indicated that the partnership business in which plaintiff was engaged was a successful business. The plaintiff was the leading director in said business with his brother, that both the plaintiff and his brother put the profits of this business back into the business; neither one drawing a salary. The profits earned by the business resulted from the joint efforts of plaintiff and his brother.

The proof indicates that the plaintiff prior to and at the time of the accident was a steady, healthy, industrious and capable business man.

We quote from the witness Flemister and note the objections as they were made, which testimony is made the basis of the second assignment:

"Q. Now, Mr. Flemister, do you know the value of George Weller's time? A. I have an idea, yes, sir.

"Q. Have a pretty good idea? A. Yes.

"Q. A pretty definite idea? A. Yes.

"Q. What is that?

"MR. ARMSTRONG: Now, I object to that as calling for an opinion which the witness is not qualified to give, and as a matter that the jury is to decide.

"THE COURT: The objection is overruled.

"MR. ARMSTRONG: The defendant excepts.

"Q. Take the man's ability prior to July 5, 1929, taking his qualifications and accomplishments and ability and industry, can you tell us the fair, cash value of his time? A. Five hundred dollars a month.

"Q. Five hundred dollars a month? A. At the very least.

"MR. ARMSTRONG: Your Honor understands we make the same objection to that, and your Honor overrules the objection?

"THE COURT: Yes.

"MR. ARMSTRONG: The defendant excepts."

The witness Cannon's objectionable testimony is as follows:

"Q. Mr. Cannon, leaving out of consideration for the time being the identical business he is in, but taking into consideration George's experience, his personality, his sales ability, his ability as a merchant, and as an executive, what would you say that the value of that man's time is on the open market, assuming that George wants to work for somebody, but is not compelled to work for him and assuming that they want him to work for them, but not compelled to employ him, but that they

can barter and trade on it and arrive at a fair market value of his time, what would you say the value of his time is, taking into consideration those things that I have enumerated, his ability and salesmanship and personality and experience, etc.? A. I would say, $7,000.

"Q. $7,000? A. Yes, sir.

"MR. ARMSTRONG: The same objection, if your Honor please. The same ruling?

"THE COURT: The same ruling.

"MR. ARMSTRONG: The defendant excepts."

The witness McGregor testified that he knew the value of plaintiff's time, and the plaintiff would be able to earn at least $7,000 a year. It is insisted that all this testimony was erroneously admitted because it called for the opinion of the witness in the examination of each of the three witnesses upon an issue being tried before the jury and an opinion upon a subject not susceptible of expert testimony and by a non-expert and was speculative and also incompetent and irrelevant to any issue of the case and did not show, or tend to show any actual loss of time by the plaintiff.

Counsel for the plaintiff insists that he was not permitted to show under the law the loss of profits in plaintiff's peculiar business; it being a business in which his brother participated, and in which the labor of others and invested capital are employed. . . .

The plaintiff testified that, prior to his accident, he and his brother had built up a successful business, that all the profits derived from the business had gone back into the business. The plaintiff had not received a fixed compensation or salary.

We are of the opinion that the evidence objected to, given by the three witnesses heretofore named in this opinion, was properly admitted by the trial judge. Our Supreme Court has held that a non-expert witness may give his opinion in testifying with regard to the physical condition of a slave (Norton v. Moore, 3 Head., 480); likewise a witness of the same character may testify as to the capacity of a sawmill (Burns v. Welch, 8 Yerg., 117); also witnesses are allowed to give testimony as to the damages to real property taken in condemnation proceedings (Wray v. Railroad, 113 Tenn., 544, 82 S. W., 471). In such cases the witness is required to state his opinion to acquire knowledge of fact, and therefore gives his opinion or judgment. Judge Wright in Norton v. Moore, supra, said, "it approaches to knowledge and is knowledge, so far as the imperfections of human nature will permit knowledge of these things to be acquired."

In Roper v. Memphis Street Railway Company, et al., 136 Tenn., 28, it was held as to earning capacity as follows:

The street railway company assigns error in respect of the admission of certain evidence of Roper's earning capacity. It is argued that the challenged evidence is opinion evidence, and not admissible in the circumstances.

The rules of evidence in cases of this character are not comparable to the rules applicable to cases of contract. Cases involving lost profits are not in point. The action is brought for the negligent killing of Roper, not for interfering with his business.

The point of inquiry was not what Roper actually earned, but his capacity to earn money. His actual earnings, if capable of proof, shed light upon his earning capacity, but served no other purpose. In considering earning capacity, the jury may look to the past, but their real inquiry is with respect to the future. The witness testifies to a fact which is incapable, ordinarily, of exact statement, even by the person most nearly concerned. His approximation is not a guess, though the witness may term it so. 3 Chamberlayne Mod. Evidence, sections 1795-1797.

"—It seems plain that wrongful interference with any capacity or function of a human being should be compensated for, aside from any existing need for the exercise of such capacity or function. The vicissitudes of life may call upon any person to put forth every effort to serve himself or those who are dependent upon him. In many if not all cases of serious personal injury the public may have an interest, and its welfare may have an interest, and its welfare may require that the injured person be compensated for the wrong done him, thus in a measure lessening the demand which may be made upon the public. Impaired ability to work is in itself an injury and deprivation, distinct from any loss of earnings it entails and the sufferer is entitled to compensation for it. It may be treated as part of the mental suffering resulting from the injury and as due to the consciousness of impaired power to care for one's self. In the nature of the case the sum which will compensate for such damage is not ascertainable by mathematical computation; it must be fixed by the jury with respect to the evidence and the probabilities, and should be sufficient to compensate therefor." Sutherland on Damages, Sec. 1249, page 4727.

"—A member of a firm is entitled to recover the value of his time without regard to the extent of his interest as a partner. It is immaterial to the right to recover that the plaintiff contemplated leaving the employment he was engaged in when injured. The jury are not bound to award damages with respect to the incapacity to pursue a particular line of work, but may award it with reference to incapacity to earn money

in any avocation the injured party might pursue in the future.''
Sutherland on Damages, Sec. 1249, page 4729.

In Corpus Juris, Volume 17, page 897, under the head of ''impairment of Earning Capacity,'' the author lays down the following rule:

> ''In general terms, the measure of damages for impairment of earning capacity may be stated to be the difference between the amount which plaintiff was capable of earning before his injury and that which he is·capable of earning thereafter. It must be noted, however, that there can be no fixed rule by which the amount of damages for impairment of earning capacity may be definitely measured. The difference in the actual earnings of plaintiff before and after the injury does not constitute the measure; hence the amount which plaintiff is capable of earning and not that which he has actually earned since the injury is to be taken for the purpose of comparison with his previous earnings as showing the diminution of earning capacity, evidence as to actual earnings subsequent to the injury being received not as tending to mitigate damages but to establish plaintiff's earning powers.''

The trial judge properly instructed the jury as to the testimony complained of as follows in his charge:

> ''In this case, gentlemen of the jury, I permitted evidence to be shown of the value of the time of the plaintiff. I permitted that evidence to go to you, for the purpose of giving you some idea, for what it is worth, you to be the judges of its value, of the weight, faith, credit and belief you will give to it, to show what earnings the plaintiff in this case has lost or will lose due to the incapacity of the injury. Loss of earnings is what the law permits a recovery for. Now, it is the duty of the plaintiff upon that to show by the greater weight of the evidence what earnings the plaintiff has lost or will lose, due to the injury, and in considering that, you are to take into consideration the evidence that was permitted to go before you as to the value of the plaintiff's time.''

We are of the opinion that there is no error in admitting the testimony of the three witnesses complained of. It results that assignments one, two and three are overruled and disallowed. The next insistence is that the verdict is grossly excessive, especially at the present day value of a dollar, with the increased purchasing power, due to present economic depression.

Learned counsel for the defendant frankly states in his brief that the question of liability has been settled by the jury's verdict, but they insist that this is not a case of gross negligence, but that it is a case in which the jury could have found that the plaintiff

was guilty of contributory negligence, or, to say the least remote contributory negligence, which would have gone in mitigation of damages.

We are of the opinion from this record that the jury properly found liability, and that the evidence tends to show that there was not even remote contributory negligence on the part of the plaintiff.

Briefly, as to plaintiff's injuries, the record shows that:

"His nose was badly broken, and his leg was broken between the ankle and knee. The break in the leg was a compound cominuted fracture. Both bones protruded through the flesh and skin tearing a large hole. He was immediately carried to the Baptist Hospital and his nose was set, and the doctor, finding his leg in such condition that the fracture could not be reduced at that time, placed it in a basket and left it there about six days in order that the swellnig might be reduced and the infection cleaned out before any attempt was made at reducing the fracture. At the expiration of six days, he was taken to the operating room. The fracture was reduced and his leg put in a cast covering his entire leg and foot and extending almost to his hip. During that time he was compelled to remain in bed for a period of twelve weeks without being able to move.

At the expiration of two and one-half months, the cast was removed, X-Ray pictures were taken, and it was found that there was no union, and the leg was again put in a cast of the same size as the first. The leg remained in the second cast for about a month at which time it was removed, a brace applied and he was told to use the leg by putting some weight on it. He tried this for a couple of days, but it hurt so badly that he then went to Dr. Willis Campbell. Dr. Campbell found it necessary to again put the leg in a cast, because even at that date, no union had started. He wore that cast three or four months and it was then removed and a cast applied which only extended up to a short distance below the knee. He wore that cast from January 22, 1930, until June, 1930, at which time it was removed, X-Ray pictures taken and there was no union.

In June, 1930, about eleven months after the accident Dr. Willis Campbell, a well known specialist in bone fractures, found it necessary to perform a bone graft operation. A piece of bone was removed from the plaintiff's uninjured leg, the broken leg was reopened and the bone removed from the good leg was grafted to the broken bone; these bones being held in place by bone-pegs. The surgeon designated the bones in the broken leg as the host bones.

About three weeks after this operation, in which three weeks the plaintiff was compelled to remain in the hospital, the cast was removed. The leg could not be examined at the time the cast was removed because of its sensitiveness. Another cast was applied, which was worn until October 7, 1930.

The trial of this cause was had on October 14, 1930. During these fifteen months, from the date of the accident to the date of the trial, the plaintiff testified that he was suffering constant pain, that he could not sleep at night, that his knee was sore, his hip was sore, that his shoulders became sore from lying flat of his back, that he had to take medicine to make him sleep, that when his leg was set he was given gas, that when he came out from under the influence of gas he was very sick and remained very sick for quite a while.

It appears further that after plaintiff's injuries, he was compelled to lie flat of his back. He could not lie on either side, and the slightest movement caused intense pain, and at the time of the trial the plaintiff was on crutches, he testified that he could not take a single step without pain. The evidence shows Dr. Campbell that if the plaintiff does not get a union of the bones in his injured leg from the operation performed in June, 1930, he will have to have another operation of the same type, and it will be months from the time of the operation before the surgeon would know whether or not he would get a union. There is considerable less chance to get a union to the second operation than to meet with success after the first bone of graft. Dr. Campbell testified that as a general thing, as to bone-graft operation it results in non-union, these non-unions as a general thing are common, and the patient is forced with either the wearing of a brace or removing the foot below the fracture or above the fracture, which means the injured leg will have to be amputated.

The proof shows that the plaintiff had spent in hospital bills, medicine, doctors' and surgeons' bills $1,538.85, and he will have further expense. He was compelled to wear a brace at the time of the trial. We think that we could safely say that his actual expenses will be more than $2,000, so we have a verdict of $18,000, which is made up of pain, suffering, and mental anguish, injury to his leg, injury to his broken nose, permanent disability up to the time of the trial and very likely a permanent disability for many months, and maybe a total disability and loss of time or compensation. In fixing the damages for pain, mental anguish, permanent or partial disability, injuries to the' plaintiff's person, the courts and juries have no fixed rule by which damages for person's injuries are mathematically calculated.

The trial judge properly instructed the jury as to the measure of damages if they reached an agreement that plaintiff was entitled to damages.

It appears from the attending doctors' and surgeons' opinions that it would be one year from the time of the trial before the plaintiff could discord the cast and walk on the injured leg without assistance; this was the testimony based on the hope and idea that the plaintiff would secure a union of the injured bones, but there is proof that the plaintiff may have to undergo an amputation.

We are of the opinion that $10,000 would not be excessive for the pain, suffering, mental anguish and injuries to the plaintiff's nose and leg, taking into consideration the fact that his leg may have to be amputated. This sum added to the amount expended and to be expended for medical and hospital bills would be $20,000, and we are of the opinion that $8,000 is not excessive to cover the loss or earning power of the plaintiff's during his past and future disability. At $6,000 per year he had practically lost $8,000 from the time of the injury to the date of trial.

Further we find that the trial judge, who heard all the witnesses testify and saw their demeanor on the witness stand, has approved the verdict of the jury in this case. The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence. Reeves v. Catignia, 157 Tenn., 173, — S. W., —.

As stated in the above case, the Supreme Court speaking through Mr. Charles C. Trabue, special Judge, said, "the right to revise even the amount of a verdict by the process of suggesting a remittitur is a delicate one, and one that a court should be slow to adopt."

It results that the verdict is not excessive, that the assignments are overruled and disallowed.

We find that the verdict is not excessive, and it is not a verdict that resulted from prejudice, passion or caprice on the part of the jury. The judgment is affirmed, the plaintiff will recover of the defendant the amount of the judgment rendered in the court below, with interest thereon from the date of its rendition, and all the costs of the cause for which execution will issue. Execution will likewise issue against the defendant and its surety on appeal bond for the costs of the appeal.

Heiskell and Senter, JJ., concur.