Lloyd Donald TULLOS, Plaintiff-Appellant,

v.

Norris I. CORLEY, Defendant-Appellee.

No. 15707.

United States Court of Appeals Sixth Circuit.

Nov. 6, 1964.

Walter Buford, Jr., Memphis, Tenn., Charles C. Finch, Batesville, Miss., on brief, for appellant.

J. Harold Ellis, Memphis, Tenn., James D. Causey, Memphis, Tenn., on brief, for appellee.

Before CECIL and EDWARDS, Circuit Judges, and TAYLOR, District Judge.

PER CURIAM.

This is an appeal from the action of the District Court for the Western District of Tennessee, Western Division, sustaining appellee's motion to dismiss for lack of jurisdictional amount. Jurisdiction was based on diversity of citizenship. 28 U.S.C. § 1332.

The action arose out of an automobile collision that occurred on the 27th of December, 1961 in Memphis. Appellant originally sued for $15,000.00 damages for personal injuries sustained in the accident and later by amendment raised the amount claimed to $25,000.00.

Appellant claimed injuries to his back, neck and head. Dr. Sage, an orthopedic specialist and his treating physician, diagnosed his condition as cervical spine sprain. He was placed in the hospital on January 1, 1962 and remained there until January 8, 1962. While in the hospital, he was placed in head halter traction and was given various drugs to ease the pain. When discharged from the hospital, he was advised to go home and go to bed and continue halter traction and to take the prescribed drugs to ease the pain. He returned to work on January 17, but was required to lay off intermittently after his return for approximately one week.

Appellant testified that he had a tingling sensation in his feet and had difficulty sleeping. When first examined by Dr. Sage, he complained of headache on the left side of his head. The pain was aggravated when he moved his head. His range of motion in the neck on bending forward was 75%, 50% on bending backward, 100% on turning head to right and 75% on turning head to left. There was tenderness over spinous processes in neck. He complained of pain in the upper spine and middle portion of the dorsal spine. No nerve deficit was found in upper or lower extremities. There was some tenderness at the juncture of low back with pelvis. Heat treatment was prescribed. When he returned for an additional examination, he was worse and was admitted to the hospital. His neck was placed in a halter. After three days in the hospital, he was given physical therapy. When released from the hospital, he was advised to stay in traction one hour in the morning and one hour in the afternoon for one week. He was to sleep in traction each night. He was advised that he could probably return to work within a week. He was again examined February 5, 1962. At that time, he could bend his neck backward 75% and 100% forward. No muscle spasm existed when he turned his neck either to the right or left. No nerve injury was found. He was again examined on March 5, 1962. This examination disclosed tightness in neck muscles. Had about 75% motion in all directions in the neck. He was examined on April 30, 1962, and his condition was unchanged. Dr. Anderson, a partner of Dr. Sage, examined him on June 25, 1962 when he complained of soreness in his neck in bad weather. Tenderness was found over spinal processes, with full range of motion in neck. A minimum amount of muscle spasm was found in the neck. His examination on August 8, 1962 disclosed tightness in the right shoulder. Continued traction was recommended. Another examination was made on September 6, 1962. At that time, he had about 75% limitation on turning neck to left and tightness in shoulder.

An examination was made on September 24, 1962 at night because he had been having pain in his neck and upper back for about four weeks which caused loss

of sleep. He was tender over spinal processes in the neck. Moving of neck caused pain. Muscle on left side of shoulder was tight as disclosed by the October 1, 1962 examination. He was advised to continue his traction and heat treatment. Examinations and treatments on October 15, November 15 and December 15, 1962 revealed his condition had not changed since previous examination. At that time, Dr. Sage felt that he would have some stiffness in neck for an indefinite period of time, with soreness in weather changes and when he became fatigued. He was of the opinion that he had some strain on the ligamentous attachments of the bone to one another. He advised him to return in about six weeks for another examination when he examined him on January 16, 1963. He did not return, but phoned the doctor in the meantime.

He was treated by a Dr. Hunter on October 17, 1962 upon the advice of Dr. Sage. Dr. Ogle, a neurosurgeon, examined him on May 22, 1963 at the instance of the defendant. He found nothing wrong with his muscles, although he complained of pain in the neck, back, head and shoulders. He also complained of deep pressure in the upper back and neck. He found no evidence of residuary injury to the nervous system.

In addition to his neurological examination, he made an orthopedic examination of the neck, extremities and back and found no evidence of injury. He was of the opinion that additional treatment was not needed. He found no evidence of disability and no medical reason for plaintiff's pain. He stated that he felt that Dr. Sage was in a better position to judge his musculoskeletal condition than he.

Harry W. Walker, appellant's employer, has not observed any change in his condition or actions since the accident.

At the time of the accident, appellant was twenty-seven years old with a grade school education, and employed as a radiator mechanic earning $82.00 per week. His total lost time from work was around 22 days. Since his discharge from the hospital and up until the time he testified on the 15th day of March, 1963, it has been necessary to use traction on his neck at his home two or three times a week. He was treated by Dr. Sage from December 27, 1961 to January 16, 1963, at which time he was advised by the doctor that further treatment would not do him any good. The doctor fixed his permanent partial disability at 10%. At the time he testified, he was earning $3.50 more per week than he earned at the time of the accident. His medical and hospital bills amounted to $341.48. His loss of wages was around $257.00. The damage to the truck he was driving amounted to $456.00, but this item was not involved in the suit.

The District Judge found the claim of $25,000.00 was a colorable one made for the purpose of conferring jurisdiction on the Federal Court.

■ Thus is presented the question, whether the foregoing evidence establishes to a legal certainty that plaintiff's claim is less than the jurisdictional amount of $10,000.00. Before dismissal may be made for lack of jurisdictional amount, it must appear to a legal certainty that the claim is less than the jurisdictional amount. Mere inability to recover an amount sufficient to give the court jurisdiction does not make the claim a colorable one and oust the jurisdiction of the Federal Court. St. Paul Mercury Indemnity Co. v. Red Cab Company, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845.

■ Evidence that appellant was earning $3.50 more per week after the accident than before bears upon his earning capacity. Roper v. Memphis Street Railway, 136 Tenn. 23, 27, 188 S.W. 588. Davis-Mize Company, Inc. v. Weller, 13 Tenn.App. 246. The test that is used, however, in determining whether the evidence is sufficient to permit loss of future wages as an item of damage is not whether the injured person earns more after the accident than be-

fore, but whether his capacity to earn in a line of work that is available to him has been decreased by reason of the injury. Central Manufacturing Company v. Cotton, 108 Tenn. 63, 65 S.W. 403; American Surety Company v. Kizer, (1963) 369 S.W.2d 736 (Tennessee Supreme Court); Greeneville Cabinet Company v. Ramsey, 195 Tenn. 409, 260 S.W. 2d 157.

The rule that there may be an impairment of earning capacity without actual loss of wages was well stated by Justice Musmanno of the Pennsylvania Supreme Court in Bochar v. J. B. Martin, 374 Pa. 240, 97 A.2d 813, 815 (1953) as follows:

"The defendants contend that there was no evidence of impairment of earning power and that the fact that Bochar's wages were higher after the accident than before proves no deterioration of earning ability. A tort feasor is not entitled to a reduction in his financial responsibility because, through fortuitous circumstances or unusual application on the part of the injured person, his wages following the accident are as high or even higher than they were prior to the accident. Parity of wages may show lack of impairment of earning power if it confirms other physical data that the injured person has completely recovered from his injuries. Standing alone, however, parity of wages is inconclusive. The office worker who loses a leg has obviously had his earning ability impaired even though he can still sit at a desk and punch a comptometer as vigorously as before. It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as a result of the tort feasor's negligence? That is the test. And it is no answer to that test to say that there are just as many dollars in the patient's pay envelope now as prior to his accident. The normal status of a healthy person is to progress, and to the extent that his progress has been curtailed, he has suffered a loss which is properly computable in damages."

In Tennessee, in fixing damages in a tort action, the Court or jury must take into consideration the nature and extent of the injury, pain and suffering of the one injured, his expenses, diminution of earning capacity, high cost of living, life expectancy, percentage of permanent partial disability, inflation and the amount awarded in similar cases. France v. Newman, 35 Tenn.App. 486, 497, 248 S.W.2d 392; Yellow Cab Company of Nashville v. Pewitt, 44 Tenn. App. 572, 584, 316 S.W.2d 17.

The standard for measuring damages is not certain and the amount is left to the judgment of the jury, guided by the facts of the case. Yellow Cab Company of Nashville v. Pewitt, supra, 584, 316 S.W.2d 17.

The complaint should not be dismissed for want of jurisdiction if demand is made for more than the jurisdictional amount, unless it appears to a legal certainty that plaintiff cannot recover the jurisdictional amount. Scottish Union & National Insurance Company v. Bejcy, (C.A.6, 1953) 201 F.2d 163; Fireman's Fund Insurance Co. v. Railway Express Agency, (C.A.6, 1958) 253 F.2d 780.

Absolute certainty is not required. It is sufficient if there is a probability that the value of the matter in controversy exceeds the jurisdictional amount. Barron & Holtzoff-Wright Federal Practice and Procedure, Rules Edition, 1960, Vol. 1, Section 24, page 108. See Aetna Casualty & Sur. Company v. Flowers, (1947) 330 U.S. 464, 67 S.Ct. 798, 91 L.Ed. 1024.

The amount that is claimed in good faith controls jurisdiction, unless such amount is merely colorable and

beyond reasonable expectation of recovery. Professor Moore states the rule as follows:

"In an action for money damages the amount in controversy is the amount which the plaintiff in good faith claims, unless it is clear, to a legal certainty, that plaintiff is not entitled to recover that sum. The basic principle was clearly stated by the Supreme Court in St. Paul Mercury Indemnity Co. v. Red Cab Co." Moore's Federal Practice, Vol. 1, p. 847.

"Where the alleged cause of action is one where the law does not clearly liquidate or limit the damages, the amount for which the plaintiff demands judgment is alone to be considered in determining the jurisdictional amount; unless it clearly appears that the amount claimed is merely colorable and beyond a reasonable expectation of recovery." Moore's Federal Practice, Vol. 1, p. 848.

 We are of the opinion that the evidence was sufficient to establish the jurisdictional amount and that appellant was entitled to have his case submitted to a jury to determine his damages. The District Judge in determining the jurisdictional amount invaded the province of the jury. The issue of liability is not involved in this appeal.

" * * * Where the jurisdictional issue as to amount in controversy cannot be decided without the ruling constituting at the same time a ruling on the merits of the case, the case should be heard and determined on its merits through regular trial procedure. Land v. Dollar, supra, 330 U.S. 731, 735, 67 S.Ct. 1009, 1011 [91 L.Ed. 1209.] If the rule were otherwise, the merits of a controversy could be summarily decided, partly on affidavits without the right of cross-examination, under the guise of determining the jurisdictional issue as to the amount in controversy. Smithers v. Smith,

supra, 204 U.S. 632, 645, 27 S.Ct. 297, 300, [51 L.Ed. 656.]" Fireman's Fund Ins. Co. v. Railway Express Agency, 253 F.2d 780, 784.

The action of the trial court in sustaining the motion to dismiss is reversed and the case is remanded to the District Court for a trial on the merits.