**Rose-Marie SCHEEL, Appellee,**

v.

**Joseph L. CONBOY, Appellant.**

**No. 75-2259.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 8, 1976.

Decided March 7, 1977.

Edward L. Breeden, III, Norfolk, Va. (Breeden, Howard & MacMillan, Norfolk, Va., on brief), for appellant.

Robert M. Hughes, III, Norfolk, Va. (Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, RUSSELL, Circuit Judge, and FIELD, Senior Circuit Judge.

RUSSELL, Circuit Judge:

Plaintiff, Rose-Marie Scheel, brought this action against Joseph L. Conboy under the federal admiralty and maritime jurisdiction,[1] seeking compensation for an injury which she sustained in an accident during a weekend trip aboard the MARWAL, a 50-foot yacht built and operated by the defendant. The district court, acting without a jury, found that the plaintiff's injury resulted from negligence on defendant's part and awarded judgment in her favor for $65,000.00 with interest and costs. Defendant appeals, challenging both the district court's finding of liability and its calculation of damages. For the reasons which follow, we affirm as to the finding of liability but remand on the issue of damages.

The accident out of which this case arose took place during an attempt to tow a 26-foot ketch from Occohannock Creek on the Eastern Shore of Virginia to Robinson's Creek on the Rappahannock River near Urbanna, Virginia.[2] As the MARWAL approached the mouth of the Rappahannock with the ketch in tow, the towline parted and plaintiff's husband boarded the ketch at defendant's request to bring it into Robinson's Creek under its own power.[3] Defendant then directed plaintiff also to board the ketch. Upon transferring to the bowsprit of the smaller boat, she crouched and placed her left hand on the bowsprit to steady herself as the vessel pitched and rolled in choppy water. At that moment, the seas caused the ketch to pitch against the MARWAL, crushing plaintiff's left long finger.

As a consequence of this accident, plaintiff has undergone three operations: first, the amputation of the injured finger between the second and third joints; second, the removal of the amputation stump and the associated metacarpal to improve function and appearance; and third, the removal of nerve remnants to eliminate pain and discomfort.

Prior to the accident, and for a short time afterwards, plaintiff was employed in Middlesex County, Virginia, as "the director of a federal program" at a wage of $4.20 per hour. According to her testimony, she resigned from that position not as a result of the accident but because the program needed revision and she did not feel competent. Apparently, her resignation was also motivated by the impending transfer of her husband to Burlington, New Jersey, where he became headmaster of St. Mary's Hall-Doane Academy.[4] Since moving to New

1. Rule 9(b), Fed.R.Civ.P.

2. Mrs. Scheel and her husband had accompanied Mr. Conboy and his wife on the trip at his invitation. While the purpose of the trip was to tow the ketch to Robinson's Creek, the parties apparently regarded it primarily as a pleasure outing. It is clear that the Scheels were social guests not seamen.

3. The original plan had been for the Scheels to go aboard the ketch at the entrance to Robinson's Creek and motor it to the dock. However, when the towline parted, Conboy decided that the transfer should take place sooner than had been contemplated. There was testimony that the sea conditions were slightly calmer in the Rappahannock where the transfer was to have been made than at the point in Chesapeake Bay where the towline broke and the transfer was actually attempted.

4. At the time of the accident in October, 1973, plaintiff's husband was the headmaster at Christchurch School in Middlesex, Virginia. His transfer to the New Jersey School took

Jersey, plaintiff has had two part-time jobs at her husband's school. The first of these paid $95 per week and the second, $85 per week.

■ We consider first the district court's determination of liability. The court found that defendant failed to exercise reasonable care in ordering plaintiff to transfer to the ketch under the conditions then existing[5] and that this failure was the proximate cause of her injury. It also found that plaintiff was guilty of little or no contributory negligence in carrying out defendant's order. These findings, which are sufficient to support a judgment against defendant for the damages sustained by plaintiff, *Kermarec v. Compagnie Generale* (1959), 358 U.S. 625, 629–32, 79 S.Ct. 406, 3 L.Ed.2d 550,[6] are not clearly erroneous and must, therefore, be sustained, *Scindia Steam Navigation Co. v. Moon Engineering Co.* (4th Cir. 1967) 379 F.2d 928, 930. Consequently, we reject defendant's contention that the district court's finding of liability must be overturned.

We conclude, however, that the case must be remanded for redetermination of the amount of damages because the district court's findings on that issue do not provide an adequate basis for evaluating defendant's contention that it erroneously considered the testimony of Dr. Benjamin Perles in determining plaintiff's lost earning capacity.

■ We agree with defendant that the challenged testimony was an inappropriate basis for calculating damages. Dr. Perles, an economist called by plaintiff as an expert, estimated her "future economic loss" to be $100,241.00.[7] In making this estimate, Dr. Perles assumed that but for the accident plaintiff would have been employed for the remainder of her working life as a secretary at the rate of $4.20 per hour—the wage she was earning at the time of the accident.[8] However, the record does not adequately support that assumption. As stated, plaintiff admits that the accident did not cause her to lose her job with the federal program. Moreover, she did not offer any evidence indicating that secretarial employment would in any event have been available to her in Burlington, New Jersey (where she now lives) or that secretaries in the Burlington area earn $4.20 per hour.[9] Thus, Dr. Perles' estimate of future economic loss was, at best, speculative, *see Whalen v. Marini* (4th Cir. 1976) 542 F.2d 1170 (decided September 22, 1976).

■ The question is, therefore, whether the district court did, in fact, rely on Dr. Perles' estimate in fixing the amount of the award. Unfortunately, the court's rather cursory discussion of damages in its memo-

place in July, 1974. While the exact date of plaintiff's resignation does not appear in the record, it was apparently near the beginning of the next federal fiscal year following the accident.

5. The district court also found that defendant was negligent in rigging the tow, in not maintaining a better lookout during the trip and in undertaking the tow under the then existing weather conditions. As we think that the ultimate finding of liability can be sustained without reference to these findings, we need not consider whether they are supported by the record nor whether the district court could properly have concluded that defendant's negligence in these respects was a proximate cause of plaintiff's injury.

6. *See also Deal v. Thrasher* (4th Cir. 1950) 182 F.2d 739.

7. Dr. Perles estimated plaintiff's net lost future earnings to be $93,851.00. To this he added lost employer contributions to social security to arrive at the total future economic loss.

8. Dr. Perles apparently believed that plaintiff was, at the time of the accident, an administrative assistant to the director of a mental health clinic—a primarily secretarial position. However, although she was originally hired for that position, plaintiff testified that by the time of the accident she had become the director of a federal program associated with the clinic. There is no evidence in the record as to her salary while in the secretarial post.

9. Although Dr. Perles testified as to the average salary of a "Class A secretary" in the Richmond, Virginia area, this testimony was irrelevant since plaintiff now lives in Burlington.

**44**

randum opinion [10] does not provide an answer to that question.[11] Thus, remand is the only possible course of action, Rule 52(a), Fed.R.Civ.P. and *Mosley v. United States* (4th Cir. 1974) 499 F.2d 1361, 1363–64.

On remand, the district court should make findings of fact which separately state the amount allowed for each element of damage (medical expenses, lost income, lost earning capacity, pain and suffering, etc.) and which, to the extent practical, set forth how the court arrived at each of those amounts, *see, e. g., Neill v. Diamond M. Drilling Co.* (5th Cir. 1970) 426 F.2d 487; *Carpenters Local 1273 of United Bro. of C. & J. v. Hill* (9th Cir. 1968) 398 F.2d 360, 363; and *Traylor v. United States* (6th Cir. 1968) 396 F.2d 837. In computing the amount to be awarded for lost earning capacity, the court should, of course, disregard the testimony of Dr. Perles for the reasons stated above.

In sum, the finding of liability is affirmed; but that part of the judgment pertaining to the amount of damages is vacated and the case is remanded for recomputation of the award and entry of findings of fact in compliance with Rule 52(a), Fed.R. Civ.P.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

---

10. The pertinent portion of the opinion states:

Plaintiff has been through three operations and another is probable. She has three fingers on her left hand instead of four.

Her medical, travel and loss of wages amount to some $4,400 plus. She is a secretary by trade, and considered herself a good typist. She will have to relearn to use the typewriter. At her age and with her prior training, it will be difficult. While she has attended college for a period of time, she does not have a degree. To return to college and obtain a degree would require the expenditure of a substantial sum of money, plus the fact there would be a loss of income for that period.

Taking into account the medical expenses, loss of income, lessening the earning capacity, pain, and suffering, an allowance of $65,-000 is fair.

11. Since the memorandum opinion indicates that the court considered "lessening of earning capacity" (see note 10 *supra*), it is probable that it did rely at least in part on Dr. Perles' testimony. Except for testimony as to the reduction in plaintiff's typing speed brought about by the loss of her finger, there was no other evidence of lost earning capacity.