Randall Brent THOMPSON et al., Plaintiffs-Appellees and Cross-Appellants,

v.

NATIONAL RAILROAD PASSENGER CORPORATION and Louisville and Nashville Railroad Company, Defendants-Appellants and Cross-Appellees.

Nos. 79–1343 to 79–1350.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 7, 1980.

Decided May 21, 1980.

Rehearing and Rehearing En Banc Denied July 15, 1980.

Tyree B. Harris, Dodson, Harris, Robinson & Aden, Nashville, Tenn., Hugh C. Griffin, Lord, Bissell & Brook, Chicago, Ill., for defendants-appellants and cross-appellees in all cases.

A. B. Neil, Jr., Nashville, Tenn., for plaintiffs-appellees and cross-appellants in Nos. 79–1343 and 79–1344.

Louis Farrell, Jr., Farrell & McCoy, Nashville, Tenn., for plaintiffs-appellees and cross-appellants in all cases.

George J. Murtaugh, Jr., Coghlan, Joyce & Nillis, Chicago, Ill., for plaintiffs-appellees and cross-appellants in Nos. 79–1347 and 79–1348.

Powers McGuire, Crystal Lake, Ill., for plaintiffs-appellees and cross-appellants in Nos. 79–1349 and 79–1350.

Before KEITH, KENNEDY and BOYCE F. MARTIN, Jr., Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

The plaintiffs in these consolidated cases are passengers who sustained injuries in the derailment of a National Railroad Passenger Corp. (Amtrak) train in Tennessee on October 1, 1975. The train was being operated at the time by employees of the Louisville & Nashville Railroad Co. (hereinafter L & N) and the derailment occurred on track owned by L & N. Amtrak stipulated that it was liable for compensatory damages to all plaintiffs except Thompson, an employee of L & N, who was traveling on a pass issued by Amtrak which contained a limitation of liability. The cases were tried by the court without a jury. The District Judge found L & N negligent and awarded all plaintiffs compensatory damages against both defendants. He rejected plaintiffs' claims for punitive damages.

Plaintiffs appeal, arguing the evidence does show intentional conduct which requires an award of punitive damages. They argue the failure to lower the speed limit after Federal Railroad Administration (FRA) regulations were promulgated and

after the FRA asked that the speed be lowered a year prior to the derailment is conduct showing a wanton disregard for the safety of the passengers. They also argue that the use of an SDP40F locomotive, a model which had been involved in several previous derailments, without testing the locomotive constituted gross, wilful, or wanton negligence.

Defendants also appeal, challenging the damage awards to five plaintiffs on several grounds. They claim all the awards are excessive, much higher than any awarded previously in Tennessee. They claim awards of separate amounts for pain and suffering, permanent injuries, and impairment to ability to enjoy life are duplicative. They assert that the award to plaintiff Barnes for impairment of earning capacity and to plaintiff Mr. Back for loss of consortium are not supported by the evidence. Finally, they argue that the limitation of liability provision in the free pass barred plaintiff Thompson from any recovery.

## I. Punitive Damages

Plaintiffs claim defendants were grossly negligent in operating the train too fast around the curve where the derailment occurred. The court found that the train was going 61 miles per hour around the curve in question, that L & N had set a speed limit of 60 miles per hour for the curve sometime before the FRA regulations provided a formula for calculating speed around a curve based on the elevation of the outside rail and the degree of curvature. See 49 C.F.R. § 213.57. L & N did not recalculate its speed limits after the regulations were passed. The regulation is ambiguous because although it specifies that the minimum elevation should be used if the elevation is not uniform, it does not tell how to measure curvature or what curvature should be used if it is not uniform. The court found that under the regulations the speed limit on this curve was at least 55.47 miles per hour, possibly as high as 57 miles per hour. It was of the opinion that traveling at speeds of 5.53 miles per hour over the speed limit did not constitute gross negligence.

Plaintiffs argue that defendants, by failing to recalculate their speed limits on the curves and maintain them, although Amtrak was asked by the FRA in September 1974 to check if its speeds were within permissible limits, constitutes wilful negligence. Defendants respond by arguing there was no evidence of prior accidents or incidents on that particular curve and that shortly before the accident, an FRA investigator and an L & N engineer traveled over the curve in a high-rail car looking for trouble spots and at that time the FRA investigator did not criticize their speed limit of 60 miles per hour. They deny that the FRA asked Amtrak to recompute speed limits on each of its thousands of curves.

Amtrak admitted it did not calculate the maximum permissible speed on the curve in question nor did it make any measurements on the curve, except such as were made by L & N.

Indeed, its retired Chief Mechanical Officer, Mr. Beischer, by deposition, stated that Amtrak did not have the personnel to make actual inspections of all the track over which Amtrak operated; Amtrak was dependent upon the railroads for this.

Mr. Vaughn, Division Engineer of Birmingham Division, L & N, by deposition, stated that prior to October 1975 he rode in a high-rail car with an FRA investigator who said he was investigating the curve in question on behalf of Amtrak. They rode over the curve, making a visual inspection. Mr. Vaughn did not know how fast they were going. The FRA investigator made no comments with respect to the curve in question.

The District Court found that defendants' speed limit was the result of a negligent miscalculation, not of gross or wanton misconduct. Rule 52(a), Fed.R.Civ. Pro., directs that findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. This Court will not overturn findings of fact by the trial judge unless it

is left with a definite and firm conviction that a mistake was made. *See J. A. Jones Construction Co. v. Englert Engineering Co.*, 438 F.2d 3, 5 (6th Cir. 1971). The evidence here fully justifies the District Judge's findings. *Southeastern Aviation, Inc. v. Hurd*, 209 Tenn. 639, 355 S.W.2d 436 (Tenn.1962), *dismissed*, 371 U.S. 21, 83 S.Ct. 120, 9 L.Ed.2d 96 (1962), cited by the District Court, is indistinguishable from the present case. There, a jury awarded compensatory and punitive damages to the plaintiff for wrongful death caused by a plane crash. The award of punitive damages was set aside. The common carrier was found to be negligent in operating with only one Automatic Direction Finder which it knew was faulty rather than with two that most planes had. However, the Tennessee Supreme Court held that there was no evidence of negligence so gross or wanton as to raise a presumption of conscious indifference to the consequences. Similarly, traveling too fast is negligence, but it does not show conscious indifference to the consequences.

█ Plaintiffs also point to the use of a SDP40F locomotive as evidence of a conscious indifference to the consequences. Although the District Court did not discuss this in its opinion, we have carefully reviewed all of the evidence on this issue.

Carroll Ashby, Chief Operating Officer of the Division of the L & N in which the train was located, was not aware of any articles which had talked about the hazards of the SDP40F. Mr. Beischer, retired Chief Mechanical Officer of Amtrak, admitted that prior to the accident there were a number of derailments drawn by the SDP40F. In several of the cases, the track was the cause of the derailment. He recalled that the Seaboard Coastline Operating Department claimed that the locomotive was at fault, and meetings were held and tests were run, but nothing was found to substantiate the claim.

The SDP40F was not a radical departure from previous designs. Amtrak was assured by General Motors (the manufacturer) that the locomotive had been subject to considerable design development from actual testing. Amtrak received 150 of these locomotives from June 1973 until late 1974 or early 1975.

During 1974, there were 34 Amtrak derailments. About six of those were pulled by the SDP40F, but at least two involved collisions with motor vehicles. About 75–80% of their trains, according to Mr. Beischer, were being pulled by the SDP40F, although only one-sixth of the derailments were drawn by the SDP40F. In 1975, there were 28 derailments, three were pulled by the SDP40F, one of which was the accident in question. Electromotive Division (of General Motors) also made tests on the locomotive March 8 and April, 1974. Mr. Beischer did not find anything in their report to indicate the locomotive was unsafe. Electromotive also conducted tests in Pennsylvania in July 1974. The SDP40F was found to exert less lateral force than exerted by the 85-foot freight train or the 3-axle freight locomotive, but greater lateral force than exerted by the 2-axle freight locomotive. In September 1974, an FRA representative suggested that before an instrumented test site was dismantled Amtrak test its SDP40F and compare it to the E 8 type locomotive. This was done, but it did not show any undue or unusual forces generated by the locomotive. Further testing on the ride was done on the Seaboard Coastline in October 1974, but nothing indicated that the SDP40F was unsafe. After the accident, an SDP40F (but not the one involved in the accident) was tested on an instrumented rail and compared to two other kinds of engines. Again, Mr. Beischer did not find the results indicating any undue lateral forces from the SDP40F.

Mr. Wiggens, Vice-President of Operations for L & N, also testified by deposition that before the accident there were seven, eight, or nine accidents involving the SDP40F. He was in particular concerned with one accident on the Seaboard Line. (Seaboard is the parent company of L & N.) He was informed the accident was caused by some pressure against the ball of the outer rail which caused it to turn over. He

then asked the engineering department or maintenance way department to check the structure of the track. However, he did not tell Amtrak or Mr. Adams that there might be a problem with lateral forces in the use of the SDP40F on curves. He apparently recalled receiving information about excessive lateral forces on the SDP40F, but could not recall receiving any such information prior to the date of the accident in question.

Mr. Mowatt-Larssen, of the FRA, testified that a conference was held with Amtrak and Electromotive Division in September 1974. This was precipitated by the derailment on the Seaboard Coastline in August 1974. One of his recommendations was to conduct fully instrumented tests on tangent and curved track to explore the possibility of undetected transient forces or other conditions that might contribute to the derailment of these locomotives prior to the purchase of more of these. However, he said he did not formally give this recommendation to Amtrak. He believes they discussed it. He did not recall any significant tests being conducted by Amtrak until 1976. He stated that the cause of all the derailments is not yet fully known.

Mr. Abbott, Mechanical Engineer, Office of the Director of Standards and Procedures, FRA, testified by deposition that he was present at the tests conducted in early 1976. The modified SDP40F had lateral forces comparable to other locomotives in use and the original version did not have substantially higher lateral forces on curves.

This Court cannot say that it is firmly and definitely convinced a mistake was made in not finding gross or wanton negligence in the continued use of the SDP40F. Repeated tests were conducted on the SDP40F and none have shown conclusively that the lateral forces of the SDP40F were excessively high. Perhaps it was negligence not to fully test the locomotive after the conference with the FRA for lateral forces as well as for ride, but this Court cannot say that defendants here acted with such a disregard of their consequences as to constitute gross negligence. The District Court's denial of punitive damages is affirmed.

## II. Damage Awards

Plaintiff Thompson's award is challenged because he was traveling on a free pass providing for a release of liability due to negligence of Amtrak or its agents. Defendants object to the amounts awarded to other plaintiffs for compensatory damages as duplicative and excessive. Two specific awards—the loss of capacity to earn to· plaintiff Barnes and the loss of consortium to plaintiff Mr. Backs—are challenged as unsupported by the evidence.

## A. Free Pass Issue

Plaintiff Thompson used his Amtrak pass to receive a free ticket for the trip involved in this case. At the time he received the ticket, he signed a request for the ticket which provided:

RELEASE FROM LIABILITY: The user of this pass ticket expressly assumes all risk of personal injury or death, loss of or damage to property, and delay in connection with this transportation, and relieves Amtrak or its agents from all liability therefor. I AGREE TO THE FOREGOING CONDITIONS.

Defendants claim this provision prevents Thompson from recovering for injuries due to defendants' negligence. The District Court held that the pass was not free as L & N was obligated to pay Amtrak a statutory cost reimbursement for providing the passenger service to Thompson, and that, since the release of liability provision is good only against gratuitous passengers, it did not bar Thompson's recovery.

The Supreme Court has held that free passes issued by interstate carriers and the conditions attached thereto are governed by federal law, not state law. *See Francis v. Southern Pacific Co.*, 333 U.S. 445, 449–50, 68 S.Ct. 611, 613, 92 L.Ed. 798 (1948); *Kansas City Southern R. Co. v. Van Zant*, 260 U.S. 459, 468, 43 S.Ct. 176, 177, 67 L.Ed. 348 (1923); *Charleston & Western Carolina R.*

*Co. v. Thompson,* 234 U.S. 576, 578, 34 S.Ct. 964, 965, 58 L.Ed. 1476 (1914).[1]

Early Supreme Court decisions held that a provision in a gratuitously issued pass which released the railroad from liability due to its negligence was valid. *See Boering v. Chesapeake Beach R. Co.,* 193 U.S. 442, 24 S.Ct. 515, 48 L.Ed. 742 (1904); *Northern Pacific R. Co. v. Adams,* 192 U.S. 440, 453–54, 24 S.Ct. 408, 411, 48 L.Ed. 513 (1904). Later Supreme Court decisions held that Congress intended to preempt the issue of free passes in interstate commerce by passage of the Hepburn Act, 49 U.S.C. § 1(7), which prohibited the issuance of free passes to all save certain enumerated classes of people including employees, and that the early decisions upholding limitation of liability provisions in free passes were part of the Hepburn Act. *See Francis, supra; Thompson, supra.* Thus, if an employee is traveling on a free pass, the Court will give effect to any release of liability provision contained therein. However, if there is consideration for the pass, the release of liability provision is not valid. *See Norfolk Southern R. Co. v. Chatman,* 244 U.S. 276, 37 S.Ct. 499, 61 L.Ed. 1131 (1917) (the Hepburn Act does not modify previous cases which held that a person traveling on a pass to care for livestock which the carrier was transporting for hire was a passenger for hire and any limitation of liability on his pass was not valid).

Thompson presents two arguments that the pass was not free but supported by good consideration: 1) the pass was issued pursuant to a collective bargaining agreement and was part of his compensation for his work, and 2) L & N had to pay Amtrak for the passes issued by Amtrak to L & N employees.

## 1. Employment as Valid Consideration for the Pass

The Rail Passenger Service Act, 45 U.S.C. § 501, *et seq.,* was amended in 1972 to provide that Amtrak shall provide to any railroad employee eligible to receive free or reduced-rate transportation under the terms of any policy or agreement existing at the time Amtrak took over intercity rail service free or reduced-rate service on Amtrak trains, with the condition that Amtrak be allowed to use a single system-wide schedule of terms. 45 U.S.C. § 565(f). The legislative history indicates Congress was merely restoring rights the employees formerly had, not creating new rights. *See* Senate Rep.No. 92–756, 92nd Cong., 2d Session, 1972 U.S.Code Cong. & Admin.News, pp. 2393, 2396, 2400; Conference Report No. 92–834, 92nd Cong., 2d Session, 1972 U.S. Code Cong. & Admin.News, pp. 2436, 2441. This statute gave employees those rights they had previous to the creation of Amtrak—if the employees had no entitlement to a free pass before, the statute would not give them any such right. Thus, free passes, if issued at all, are not issued by virtue of this statute; they must be issued by virtue of a contract of employment or of a policy of the employer. The statute requires only that Amtrak recognize those pre-existing contracts or policies.

The collective bargaining agreement between L & N and its employees provides in Rule 44: "Employees and those dependent upon them for support will be given the same consideration in issuing free transportation as is granted other employees in the service." This provision only guarantees equal treatment, not that employees shall receive passes. Plaintiff Thompson responds by arguing that L & N had a custom of giving these passes and that this custom was an inducement to work which constitutes the consideration.

In this Circuit, there is an apparent conflict regarding employment as consideration for free passes. In *Martin v. Greyhound Corp.,* 227 F.2d 501 (6th Cir. 1955), *cert. denied,* 350 U.S. 1013, 76 S.Ct. 657, 100 L.Ed. 873 (1956), this Court held that an

---

1. If the transport were wholly intrastate, then federal law would not apply. State law would be controlling. *See N. Y. Central R. Co. v. Mohney,* 252 U.S. 152, 40 S.Ct. 287, 64 L.Ed. 502 (1920); *Alderman v. Baltimore & Ohio R. Co.,* 113 F.Supp. 881 (S.D.W.Va.1953); *Olsen v. Draper,* 112 F.Supp. 859 (E.D.N.Y.1953).

employee of a bus company who was injured while on a personal journey pursuant to a free pass was not barred from recovery by virtue of the limitation of liability provision contained in the free pass. As the employer was required to give these passes by the collective bargaining agreement, the pass was supported by consideration and was not gratuitous. *Martin*, unlike *Charleston & Western Carolina R. Co. v. Thompson, supra*, did not involve a mere possibility of getting an occasional free pass, but involved a definite commitment to grant free passes. However, the Court in *Martin* did not discuss *Francis*, the most recent Supreme Court case on the subject of free passes in interstate transport, and did not quote the collective bargaining agreement.

More recently, this Court in *Uhlik v. Penn Central R. Co.*, 459 F.2d 460 (6th Cir. 1972), held that plaintiffs who were riding the New York Central Railway pursuant to free passes issued by the railroad were barred from recovery by provisions in the passes releasing the railroad from liability and disclaiming any consideration for the passes. The husband had been laid off from his employment. Without mentioning *Martin*, the Court said there was no proof of consideration.

Although *Martin* involved a bus while *Uhlik* involved a train, the cases are not distinguishable on that basis since the National Motor Carrier Act, 49 U.S.C. § 317(b), makes the provisions of the Hepburn Act applicable to common carriers by motor vehicles. Thus, decisions of the Supreme Court interpreting free passes on railroads under the Hepburn Act would seem to be equally applicable to busses. *See Atlantic Greyhound Lines v. Skinner*, 172 Va. 428, 2 S.E.2d 441 (1939).

*Martin* can only be distinguished on the basis that in *Martin* the collective bargaining agreement required the issuance of free passes, whereas in *Uhlik* there was no showing that any employment contract required

the issuance of free passes. Whether a requirement in a collective bargaining agreement that free passes be issued would be sufficient consideration given the rationale of the Supreme Court cases concerning free passes need not be decided here since there is no such express requirement in the present case.

In *Francis, supra*, in which the Court, per Justice Douglas, held that the free pass was a gratuity even though it had been issued to an employee, 333 U.S. at 449, 68 S.Ct. at 613, the dissent, per Justice Black, would not have given effect to the limitation of liability condition of the pass.[2] After reviewing legislative history, the dissent concluded that Congress recognized that passes issued to employees were part of the consideration for their employment. Some unions, the dissent suggested, had bargaining agreements on passes. 333 U.S. at 467 & n.7, 68 S.Ct. at 621. However, the Court was not presented with the consideration argument upon which the dissent in part relies—the petitioner did not argue that the employee's pass was supported by valid consideration. The petitioner conceded the limitation of liability provision in the pass would have been a defense to the employee's suit for negligence against the railroad had the employee lived. *See* Petitioner's Brief in Support of the Petition for Writ for Certiorari, at 47.

The consideration argument was, however, presented to the Supreme Court in *Thompson, supra*. Plaintiff argued and the Georgia Court of Appeals agreed that the free pass used by the plaintiff was not a gratuity. The consideration for the pass was plaintiff's husband's employment. *See* Brief for Defendant in Error on Merits of Appeal, at 3–5; Defendant in Error's Motion to Dismiss and Brief in Support of the Motion, at 2–3, 4–5; *id.*, at 10–11 (opinion of the Georgia Court of Appeals). The Supreme Court, per Justice Holmes, rejected plaintiff's argument. After stating that the railroad was under no obligation to

---

2. The dissent would also not have applied federal law but would have applied state law. State law here would not avail the plaintiff since Tennessee has recognized the validity of

waiver of liability provisions. *See Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188 (Tenn.1973); *Louisville & Nashville R. Co. v. Hadley*, 11 Tenn.App. 642, 646 (1930).

issue the free passes, the Court held that even if

> the possibility of getting an occasional free pass entered into the motives of the employee in working for the road, the law did not contemplate his work as a conventional inducement for the pass, but, on the contrary, contemplated the pass as being what it called itself, free.

234 U.S. at 578, 34 S.Ct. at 965.

Thus, if there is only the possibility of a free pass, *Thompson* forecloses the issue: the pass is a gratuity and any conditions attached limiting liability of the carrier for its negligence will be enforced. That this possibility of a free pass is mentioned in a collective bargaining agreement does not change the nature of the obligation—the carrier remains free not to give passes to anyone. While this Court recognizes that L & N may have a consistent custom of giving passes to all its employees and this custom may be an important motivating factor in the employees' decisions to work for the carrier, this Court is nevertheless bound by the decisions of the Supreme Court. In the present case, the record does not show L & N was required to give these passes to its employees, but only if it gave passes to any of its employees, it must give passes on the same basis to the railroad employees. This mere possibility of a free pass is not sufficient consideration to make plaintiff Thompson a passenger for hire rather than a gratuitous passenger.[3]

**3.** As the dissent in the present case notes, the *Thompson* decision is close to 70 years old. However, the Supreme Court had the opportunity to change its rule when it reexamined the issue in 1949 in *Francis*, but it did not do so. We feel bound by the decisions of the Supreme Court unless and until the Supreme Court changes its decision. Were we free to do so, we might well reexamine whether the waiver of liability provision is against public policy and should not be enforced. Contracts limiting the liability of a party for his negligence are frequently held to be against public policy. What is against public policy depends on a case-by-case determination, but the rule is frequently stated that a party cannot protect himself by contract against liability for negligence in the performance of a legal duty or a duty of public

## 2. Payment by L & N to Amtrak as Consideration for the Pass

The Railway Passenger Service Act provides that Amtrak shall be reimbursed by the railways for such costs as may be incurred in providing free or reduced-rate passes to the employees of the railways. If the parties cannot agree on the amount of payment, the matter would be referred to the Interstate Commerce Commission. *See* 45 U.S.C. § 565(f). Defendants report that the Commission awarded Amtrak a reimbursement cost of $.0087 per mile which was approximately $2.00 for plaintiff Thompson's round trip between Nashville, Tennessee and Decatur, Alabama (about 220 miles).

The legislative history indicates that Congress did not intend the reimbursement cost to be based on actual fares. It was anticipated that the reimbursement would be minimal since the passes would be issued on space available. *See* Senate Report, No. 92–756, 92nd Cong., 2d Session, 1972 U.S. Code Cong. & Admin.News, pp. 2393, 2400.

The payment from L & N to Amtrak is similar to a service fee—it reimburses Amtrak for expenses in carrying an additional passenger on a train with empty seats, such as issuing the ticket, but Amtrak derives no profit therefrom. Other courts have held that the payment of small fees does not constitute consideration that would make the free pass other than a gratuity. *See Sims v. Northwest Airlines, Inc.*, 269 F.Supp. 272, 273 (S.D.Fla.1967) ($45 service

service, or where a public duty is owed or public interest is involved, or where public interest requires the performance of a private duty. 175 A.L.R. 8, 14 (1948). Courts are generally hostile to contracts limiting liability and will strictly construe them. *See Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 89–91 (1955) (discussing hostility towards contracts limiting liability; holding that towers cannot so contract); *see generally* 57 Am.Jur.2d *Negligence* §§ 20–31 (1971); *Restatement of Contracts* §§ 574, 575 (1932); 175 A.L.R. 8 (1948). Generally, contracts limiting liability for negligence will also not be upheld where the bargaining position of the parties is so unequal that one party is at the mercy of the negligence of the other. *See* W. Prosser, Handbook on the Law of Torts 442–45 (4th ed. 1971).

charge for plane tickets for plaintiff and family); *Richards v. Atchison, Topeka & Santa Fe R. Co.*, 226 F.Supp. 812, 814 (S.D. Iowa 1964) ($4.40 for seat reservations on train); *Luerssen v. Seaboard Air Line R.*, 203 F.Supp. 707, 708 (E.D.N.Y.1962) (payment for Pullman accommodation); *Braughton v. United Air Lines, Inc.*, 189 F.Supp. 137, 140–42 (W.D.Mo.1960) (payment of $6.00 service charge for train tickets); *Holeman v. Louisville & Nashville R. Co.*, 319 S.W.2d 47, 48 (Ky.1958), *cert. denied*, 359 U.S. 1012, 79 S.Ct. 1148, 3 L.Ed.2d 1036 (1959) (purchase of Pullman accommodations). This Court agrees that the payment of such small fees cannot be said to put the passenger traveling on a free pass in the same position vis-a-vis Amtrak as a passenger who paid for his ticket.

Since under established law neither plaintiff Thompson's employment nor the payment of the small fee to Amtrak by L & N constitute consideration for the free pass, Thompson was traveling gratuitously and the limitation of liability provision of that pass is valid, and Thompson is barred from all recovery.

While it seems harsh that Thompson is barred from recovery while the other plaintiffs, are not, this Court can only point to the Supreme Court rationale in *Adams, supra:*

> The railway company was not, as to Adams, a carrier for hire. It waived its right as a common carrier to exact compensation. It offered him the privilege of riding in its coaches without charge if he would assume the risks of negligence. He was not in the power of the company and obliged to accept its terms. They stood on an equal footing. If he had desired to hold it to its common law obligations to him as a passenger, he could have paid his fare and compelled the company to receive and carry him. He freely and voluntarily chose to accept the privilege offered; and, having accepted that privilege, cannot repudiate the conditions.

> It was not a benevolent association, but doing a railroad business for profit; and free passengers are not so many as to induce negligence on its part. So far as the element of contract controls, it was a contract which neither party was bound to enter into, and yet one which each was at liberty to make, and no public policy was violated thereby.

*Northern Pacific R. Co. v. Adams*, 193 U.S. 440, 453, 24 S.Ct. 408, 411, 48 L.Ed. 513 (1904), quoted with approval in *Francis v. Southern Pacific Co.*, 333 U.S. 445, 448 n.2, 68 S.Ct. 611, 612, 92 L.Ed. 798 (1948).

## B. Duplicative Awards

The District Court awarded five elements of damages to plaintiffs Barnes, Mrs. Backs, and Darle: 1) expenses, 2) pain, suffering, and fright, 3) permanent injuries, 4) impairment of earning capacity, and 5) impairment of enjoyment of life.[4] Defendants claim that impairment of enjoyment of life duplicates pain and suffering plus permanent injuries. They also claim there is no authority for awarding separate amounts for each intangible element of damages.

Damage awards by a trial court without a jury are findings of fact, which must stand unless they are clearly erroneous. *See* Rule 52(a), Fed.R.Civ.Pro.; *Traylor v. United States*, 396 F.2d 837, 839 (6th Cir. 1968); *Neal v. Saga Shipping Co., S.A.*, 407 F.2d 481, 487 (5th Cir.), *cert. denied*, 395 U.S. 986, 89 S.Ct. 2143, 23 L.Ed.2d 775 (1969); *Safer v. Perper*, 569 F.2d 87, 100, 186 D.C.App. 256 (D.C.Cir.1977). That is, the awards must stand unless this Court is left, after viewing the entire record, with a definite and firm conviction that a mistake has been made. *Petition of U.S. Steel Corp.*, 436 F.2d 1256, 1261 (6th Cir. 1970), *cert. denied*, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971). The District Court must make subsidiary findings which indicate the measure of damages used and the considerations which led to the award.

---

4. Four other plaintiffs also received awards,— Nixon, Thompson's wife and his two children, —but defendants do not appeal those awards.

This Court has held that the elements of the damage award must be specified and the amount allocated to each disclosed to enable the appellate court to review the awards. *See Traylor, supra,* 396 F.2d at 839–40.[5]

Tennessee recognizes impairment of enjoyment of life as an element of intangible damages. *See Martin v. Southern R. Co.,* 225 Tenn. 77, 80–81, 463 S.W.2d 690, 691 (1970) (court assumed the difference between the award and the proven damages was awarded for "the intangible elements of damage such as pain, suffering, inconvenience, and deprivation of the normal enjoyments of life"); *Dixie Feed & Seed Co., Inc. v. Byrd,* 52 Tenn.App. 619, 637, 376 S.W.2d 745, 753 (1963), *cert. denied,* Tenn.S. Ct., *cert. denied,* 379 U.S. 15, 85 S.Ct. 147, 13 L.Ed.2d 84 (1964) (intangible elements of damages included "pain and suffering, inconvenience and the deprivation of the enjoyment of the normal activities of life"). However, both of these cases involved jury verdicts which were lump sums rather than itemized amounts for each kind of damages.

Other Tennessee cases list the considerations for determination of damages as the nature and extent of the injury, pain and suffering, expenses, loss of earning capacity, percentage of permanent disability, inflation, and the amount awarded in similar cases. *See Tullos v. Corley,* 337 F.2d 884, 887 (6th Cir. 1964); *Yellow Cab Co. of Nashville, Inc. v. Pewitt,* 44 Tenn.App. 572, 316 S.W.2d 17, *cert. denied,* Tenn.S.Ct. (1958); *France v. Newman,* 35 Tenn.App. 486, 248 S.W.2d 392 (1951), *cert. denied,* Tenn.S.Ct. (1952).

This Court has not found any Tennessee case which awarded both damages for permanent injury and impairment of enjoyment of life. However, this Court has recognized a difference between pain and suffering and impairment of enjoyment of life, *see U. S. Steel, supra,* 436 F.2d at

1265–67, and between pain and suffering and permanent injuries, *see Traylor, supra,* 396 F.2d at 839–40. Defendants rely upon *Winter v. Pennsylvania R. Co.,* 45 Del. 108, 68 A.2d 513 (Del.1949), in which the Delaware Court held that deprivation of mental and spiritual comfort and enjoyment was not a separate element of damages under Delaware law. Instead, the jury was to consider all activities which may be impaired—business, pleasure, or otherwise—when calculating the amount for permanent injuries. However, conceptually, these categories of intangible damages are distinct. Compensatory damages are meant to make the person whole in the only way the court knows how, which is to give an equivalent in money for each loss suffered. Pain and suffering, permanent injury, and loss of enjoyment of life each represent separate losses which the victim incurs. Permanent impairment compensates the victim for the fact of being permanently injured whether or not it causes any pain or inconvenience; pain and suffering compensates the victim for the physical and mental discomfort caused by the injury; and loss of enjoyment of life compensates the victim for the limitations on the persons's life created by the injury. It may be argued that a court should not award a person damages for a permanent injury which does not cause any pain and suffering or does not limit the victim's life in any way. But before the tortious conduct, the victim did not have the permanent injury. After the conduct the victim has been permanently injured. The court cannot make the victim whole by taking away the permanent injury—it can only award a monetary sum roughly equivalent to the severity of the permanent injury. The District Judge obviously thought these were distinct categories for he did not award the same amount for permanent injuries as he did for impairment to enjoy-

---

5. *See also Hatahley v. United States,* 351 U.S. 173, 182, 76 S.Ct. 745, 752, 100 L.Ed. 1065 (1956) (to satisfy Rule 52(a), court must allocate awards to each plaintiff rather than one lump sum); *Scheel v. Conboy,* 551 F.2d 41, 43–44 (4th Cir. 1977); *Hysell v. Iowa Public Service Co.,* 534 F.2d 775, 787 (8th Cir. 1976);

*Fuchstadt v. United States,* 434 F.2d 367, 370 (2d Cir. 1970); *Lettsome v. United States,* 411 F.2d 917, 923 (5th Cir. 1969). *But see Pritchett v. United States,* 425 F.2d 663, 664 (5th Cir. 1970); *Neal v. Saga Shipping Co., S.A.,* 407 F.2d 481 (5th Cir.), *cert. denied,* 395 U.S. 986, 89 S.Ct. 2143, 23 L.Ed.2d 775 (1969).

ment of life. If the District Court had included impairment of enjoyment of life as an element of permanent injury, the awards in the permanent injury category would probably have been higher.

Since the Tennessee courts have recognized on different occasions impairment of enjoyment of life and permanent injuries, and since this Court has instructed lower courts to itemize damages, this Court cannot say the District Court erred in either itemizing the award or the categories it chose to use.[6]

## C. Plaintiff Barnes' Loss of Earning Capacity

Defendants urge that the award of $60,-000 to plaintiff Barnes for impairment of earning capacity was unsupported by the evidence as there was no proof of any lost earnings and no loss of capacity to earn since Barnes is still working at his previous job.

Tennessee compensates a personal injury victim not for the actual lost earnings but for the loss of the capacity to earn. A plaintiff may recover for lost capacity to earn even though there has been no actual loss of earnings, see *Dixie Feed, supra*, 376 S.W.2d at 750; *Southern Coach Lines, Inc., v. Wilson*, 31 Tenn.App. 240, 214 S.W.2d 55, *cert. denied*, Tenn.S.Ct. (1948), or the plaintiff made more money after the accident than before, see *Tullos v. Corley*, 337 F.2d 884, 886 (6th Cir. 1964). Thus, that Barnes did not prove loss of earnings is not fatal to his recovery.

The District Judge found that Barnes was a 65-year-old partner in a stock brokerage firm with an income in excess of $150,000 per year who was unable to resume full-time duties until approximately January 1, 1976. Barnes testified that he supervised all the branch offices of the firm which are spread throughout the United States and that he was required to travel to these offices as part of his duties. The District Judge found that Barnes was unable to travel, had an assistant to relieve him of some of his duties, and lost about two months of work. Since Barnes could have worked as long as he was physically and mentally able, the District Court found that his capacity to earn was greatly impaired.

*Wilson v. Cook Manufacturing Co.*, 56 Tenn.App. 129, 405 S.W.2d 584, *cert. denied*, Tenn.S.Ct. (1966), cited by defendants, is distinguishable. There, plaintiff was not allowed to recover for loss of earnings capacity but plaintiff's doctor testified plaintiff had a normal and complete recovery. Plaintiff himself admitted the only pain he had felt had gone away and he had resumed his former job. Here, Barnes is permanently disabled and has had to curtail his former duties. Plaintiff is entitled to his past loss of earning capacity as well as his future. *See Southern Coach Lines v. Wilson, supra*, 214 S.W.2d at 57.

This Court cannot say that the District Court erred in awarding $60,000 to Barnes for loss of earning capacity. Two months' salary for someone earning $150,000 per year would be $25,000. (For someone earning $200,000 per year, as Barnes testified his earnings were, two months' salary would be about $33,000.) When one adds the inability to now perform all his duties and that he can work as long as he is able to perform his duties, $60,000 is not unreasonably high.

---

**6.** The District Court awarded sums for "pain, suffering, and fright" as one category of damages. Tennessee law does not allow recovery for fright alone. *See Hoskins v. Blalock*, 384 F.2d 169, 171 (6th Cir. 1967); *Memphis St. R. Co. v. Bernstein*, 137 Tenn. 637, 194 S.W. 902 (1917); *Colsher v. Tennessee Electric Power Co.*, 19 Tenn.App. 166, 84 S.W.2d 117, *cert. denied*, Tenn.S.Ct. (1935). *See also Bowers v. Colonial Stages Interstate Transit, Inc.*, 163 Tenn. 502, 43 S.W.2d 497 (1931) (no recovery for mental anguish alone). But Tennessee does allow recovery for physical pain and suffering which results from fright. *See Bernstein, supra; Trent v. Barrows*, 55 Tenn.App. 182, 397 S.W.2d 409, *cert. denied*, Tenn.S.Ct. (1965). Although the District Court noted in a footnote that the passengers were badly frightened by the experience, none of his discussion of the plaintiffs' injuries which justified the awards specifically mentioned the plaintiffs' fright. It appears that the District Court did not rely upon fright alone to make his awards.

### D. Plaintiff Mr. Backs' Loss of Consortium

Defendants claim the award of $25,000 to Mr. Backs for the loss of consortium of his wife was erroneous because there was no evidence of the monetary value of the lost services Mrs. Backs performed around the house and because there was no evidence pertaining to any lost conjugal relations.

In *Martin v. Southern R. Co., supra*, the court refused to consider as an element of damages the amount for the full-time help the plaintiff would need as the probable cost of this element of damages was not presented in the evidence. But that case did not involve a loss of consortium which is not as easy to value as the cost of hired help. In *Lamb v. Jones Wholesale Co., Inc.*, 454 F.Supp. 129 (E.D.Tenn.1978), the court remitted the award where the wife had not proved a loss of consortium but only a loss of her husband's services mowing the grass, gardening, and driving the car. There was no proof of monetary value of these services, but the court did not require proof. It merely held it did not think these services were worth $15,000 and suggested a remittitur of $12,000. The Tennessee Supreme Court has held that a father need not prove the loss of services resulting from his son's injury by an exact calculation in order to recover for such a loss. *Central Manufacturing Co. v. Cotton*, 108 Tenn. 63, 67, 65 S.W. 403 (1901). The Tennessee Appellate Court has held a husband need not prove loss of his wife's consortium with exactness. *See All v. John Gerber Co.*, 36 Tenn.App. 134, 143, 252 S.W.2d 138, *cert. denied*, Tenn. S.Ct. (1952). Thus, Mr. Backs should not be barred from recovering even though he did not prove the monetary value of his wife's services which he has lost.[7]

Mrs. Backs testified that she cannot do her household chores, cannot cook, cannot drive, and needs help getting out of the tub.

Mr. Backs testified that they now eat out most of the time since his wife cannot cook. He now must do all the housework, whereas before he did none of it. He further testified that her physical and emotional condition has changed dramatically since the accident.

Consortium has been defined as "not only loss of support of services, [but also] such elements as love, companionship, affection, society, sexual relations, solace and more." *See Rodriquez v. Bethlehem Steel Corp.*, 12 Cal.3d 382, 525 P.2d 669, 115 Cal.Rptr. 765 (1974) (quoting *Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897 (1968)); *All, supra*, 36 Tenn.App. at 141, 252 S.W.2d 138.

The District Court found that Mr. Backs has been required to alter his usual business habits and practices to care and assist his wife. He is deprived of her affection, society, companionship and consortium and will have to expend sums of money in the future to pay for the services she would have performed had she not been injured.

While $25,000 may seem high for the loss of household services and companionship that was established in the record, this Court may not substitute its judgment for that of the trial court. If this Court were to order a remittitur, it could only order a remittitur to such an amount as would not seem palpably excessive, giving to the trial court the latitude in fixing the amount to which it is entitled. *See Dixie Feed, supra*, 376 S.W.2d at 754; *Olson v. Sharpe*, 36 Tenn.App. 557, 259 S.W.2d 867, 875, *cert. denied*, Tenn.S.Ct. (1953). Since the award as it stands does not appear palpably excessive, this Court affirms the award to plaintiff Mr. Backs.

### E. Excessiveness of the Awards

Defendants object to the awards to plaintiffs Barnes, Mr. Backs, Mrs. Backs, and Darle as being excessive, much higher than awards previously granted in Tennessee. Plaintiffs claim the cases defendants point to are not truly comparable and that the

---

7. For an interesting method of making a valuation of lost services, see Kiker, *Evaluating Household Services*, Trial, Feb. 1980, at 34.

court must consider the effects of the high inflation this country has recently experienced.

The amount of a damage award in a personal injury action is for the jury or, in a non-jury case, the trial judge who heard the evidence. Absent a showing of bias, passion, or corruption, the excessiveness of a verdict is left to the trial court's discretion. The appellate court will only consider whether the trial court abused its discretion by granting an award so large as to shock the judicial conscience. *See Stengel v. Belcher*, 522 F.2d 438, 444 (6th Cir. 1975), *cert. dismissed*, 429 U.S. 118, 97 S.Ct. 514, 50 L.Ed.2d 269 (1976); *Kroger Co. v. Rawlings*, 251 F.2d 943, 945 (6th Cir. 1958); *Olson v. Sharpe*, 36 Tenn.App. 557, 259 S.W.2d 867, *cert. denied*, Tenn.S.Ct. (1953); *Yellow Cab Co. v. Pewitt*, 44 Tenn.App. 572, 316 S.W.2d 17, 22, *cert. denied*, Tenn.S.Ct. (1958); *Clinchfield R. Co. v. Forbes*, 57 Tenn.App. 174, 417 S.W.2d 210, 217 (1966), *cert. denied*, Tenn.S.Ct. (1967).

When considering whether an award is excessive, the Court will consider other awards in other cases, *see Martin v. Southern R. Co., supra*, 225 Tenn. at 82, 463 S.W.2d 690; *France v. Newman*, 35 Tenn. App. 486, 248 S.W.2d 392 (1951), *cert. denied*, Tenn.S.Ct. (1952), as well as the nature and extent of the injuries, suffering, expenses, diminution of earning capacity, inflation and high cost of living, age and expectancy of life, *see Olson v. Sharpe, supra*, 259 S.W.2d at 875.[8] But the cases involving similar injuries are in no sense controlling. *See Petition of U. S. Steel Corp.*, 479 F.2d 489, 501 (6th Cir.), *cert. denied*, 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973).

Defendants compare the back injuries of Barnes to several cases involving back injuries and the leg injuries of Darle and Mrs. Backs to cases involving leg injuries. However, a number of these cases are ten years old or more, did not involve plaintiffs with comparable occupations and earning capacities, or apparently did not involve permanent injuries like those of the plaintiffs in this case. The District Court stated what factors he considered in making the awards and supported his awards by findings with respect to the plaintiff's conditions and the future pain and limitations they are likely to suffer. Although the awards may be high, they do not shock this Court's conscience. Considering the present deflated value of the dollar and that personal injury damages are unliquidated without any fixed measure of mathematical certainty, *see Kroger v. Rawlings*, 251 F.2d 943, 945 (6th Cir. 1958), these awards are not excessive.

The District Court's judgments with respect to all plaintiffs save plaintiff Thompson are affirmed. The judgment in favor of plaintiff Thompson is reversed.

KEITH, Circuit Judge, concurring in part, dissenting in part.

I am unable to agree that the contractual provisions in this case shielding the defendant carriers from adjudicated liability should be given legal effect for two reasons. First, I am persuaded that there existed consideration for the railroad pass, and therefore, this case is controlled by *Martin v. Greyhound Corporation*, 227 F.2d 501 (6th Cir. 1955), *cert. denied*, 350 U.S. 1013, 76 S.Ct. 657, 100 L.Ed. 873 (1956). Second, it is contrary to public policy to permit the contracting away of the liability for one's negligent conduct to one's employees where the employer enjoys the benefits of what is in effect a public monopoly. In effect defendants seek the benefits of monopoly status as well as the fruits of the free enterprise system.

*Charleston & Western Carolina Railroad v. Thompson*, 234 U.S. 576, 34 S.Ct. 964, 58 L.Ed.2d 1476 (1914), serves as the cornerstone of the majority opinion. *Thompson* holds that the mere possibility of an occasional pass from the railroad company, even

---

**8.** On the propriety of considering inflation, also see *Martin v. Southern R. Co., supra*, 225 Tenn. at 83, 463 S.W.2d 690; *France, supra*.

if constituting a partial motive for employment, would be insufficient consideration. Thompson's recovery was accordingly barred. I question the wisdom of applying this seventy year old notion of consideration to our modern world. Today's decision requires railroad employees to make an established benefit—riding on its employer carrier for less than published rates—the subject of a collective bargaining agreement and possibly a strike before this court recognizes the benefit as being given in a bargained-for-exchange.

To believe that business organizations actually make a charitable "freebie" to its employees when employees or members of their families ride under the pass, is to ignore economic reality. Employees certainly weigh such factors before either taking initial employment or evaluating potential provisions for purposes of collective bargaining sessions. Given the harsh fact that fuel costs have skyrocketed (and concomitantly increased travel costs), it borders on the absurd to suggest that the availability of travel passes at reduced rates does not induce employment with the railroad.

In *Martin v. Greyhound Corporation, supra,* this circuit recognized that "[t]he passes were in a real sense part of the compensation paid . . ." While the specific contractual provision dispelled all possible speculation that the character of the pass was a gratuity, *Martin* did recite *Norfolk Southern Railroad Co. v. Chatman,* 244 U.S. 276, 37 S.Ct. 499, 61 L.Ed. 1131 (1916), in which the Supreme Court acknowledged that "the mere designation of a pass as free does not constitute it a gratuity." *Id.* As the plaintiff's employer, Louisville and Nashville Railroad, was obligated to pay Amtrak some cost in providing passenger service to Thompson, consideration was in fact present.[1]

The second reason which prevents my concurrence in the majority's denial of employee Thompson's claim, is purely a matter of public policy. We should not sanction outmoded policies, technical defenses, or fictions which operate to defeat a just application of the law. Here, employee Thompson accepted a traveling pass which realistically constituted compensation for his status as an employee, and in the same action was required to waive injury resulting from his employer's negligence. Must Thompson refuse a part of his compensation, i. e., the railroad pass, in order to maintain his right of legal redress? Clearly the employer railroad utilized its superiority to insulate itself from suit by its employees. This contractual waiver was not the result of a collective bargaining agreement. Judicial decisions in other areas of the law provide ample support that it is contrary to public policy to permit such overreaching in this modern day. In 1914, when *Charleston & Western Carolina Railroad v. Thompson, supra,* was decided, the validity of a waiver of liability was undisputed. With the emergence of modern notions of public policy this is no longer true today.[2] Because the majority opinion refuses to permit this ancient manner of overreaching to die by denying plaintiff employee Thompson his right of recovery, I dissent.

---

1. Amtrak argues that the rejection by the Interstate Commerce Commission of Amtrak's request for full reimbursement of allocated cost eliminates consideration as an issue. But a review of the record reveals that $.0087 per mile was awarded; consideration therefore was present.

2. In addition to the authorities cited in n.3 of the majority opinion, see the Uniform Commercial Code on unconscionability, U.C.C. §§ 2–302, 2–719.