HANCOCK, APPELLEE, *v.* NORFOLK AND WESTERN RAILWAY COMPANY, APPELLANT.

(No. 51702 — Decided March 23, 1987.)

*Michael B. Michaelson,* for appellee.

*Arter & Hadden, Curtiss L. Isler, John D. Maddox* and *Irene C. Keyse-Walker,* for appellant.

PATTON, J. Plaintiff-appellee Roger T. Hancock was injured while in the employ of defendant-appellant Norfolk and Western Railway Company (hereinafter "Railway"). Hancock subsequently brought this action pursuant to the Federal Employers' Liability Act, Sections 51-60, Title 45, U.S. Code (hereinafter "FELA"), to recover past and future economic losses incurred by reason of the Railway's alleged negligence. At the close of the trial, the jury awarded Hancock damages in the amount of $1,510,000. The facts giving rise to this appeal, as contained in the record, provide the following:

Hancock was hired by the Railway in May 1979 as an apprentice carman. For the period of his employment, Hancock's job was to hang sides on coal cars in the Railway's assembly line in Virginia. Hancock learned his employment responsibilities by observing his predecessor at the position for several days. In 1981, Hancock was promoted to the status of an "upgraded apprentice."

Hancock explained that he and his co-worker, Fred Bond, stood on a metal scaffold to fit sheets of metal to the coal car's side. When the metal sheet was properly fitted and bolted, the car would proceed along the assembly line. The coal cars were approximately fifteen feet high. The floor of the scaffold on which Hancock and Bond worked was approximately ten feet off the ground. The scaffold was two feet wide and extended in excess of the length of a typical coal car. The scaffold also had a one- to two-inch lip at the base and a metal hand railing which was approximately thirty-five inches high. The workers stored many of their tools and other equipment on the scaffold.

Periodically, the workers would

need to have their supplies of bolts replenished. The bolts, contained in boxes weighing close to eighty pounds, would be delivered to the workers' scaffold by forklift. The forklift ordinarily would raise the pallet on which the boxes were placed to a level approximately two inches above the floor of the scaffold. However, due to the crowded and confined work area, the forklift was unable to directly approach the workers' scaffold. Instead, the forklift approached the scaffold at an angle such that one corner of the forklift was as close as six inches from the scaffold while the other corner was as far away as two feet from the scaffold. As a result of these awkward conditions, the workers frequently had to reach over the metal railing to lift the boxes off the pallet and onto the scaffold. The record discloses that supervisors regularly passed by the employees but at no time advised the employees that their conduct was unsafe or in violation of any Railway safety rule.

On March 4, 1982, Thomas Burwell, another Railway employee, delivered a supply of bolts to Hancock and Bond by forklift in the normal manner. After the pallet was raised to the appropriate height, Hancock bent over the thirty-five-inch handrail to pick up a box of bolts. Hancock felt a sharp pain and heard a snap in his back. He sensed additional pains in his legs. Hancock attempted to stand up but was unable to do so, and he remained draped over the handrail. With the assistance of his co-workers, he was helped off the scaffold and was taken to the hospital. While Hancock was being lowered from the scaffold, his co-worker, Fred Bond, continued to lift the eighty-pound boxes from the pallet in a similar manner without correction from the employees' supervisors, who were standing by.

Hancock testified that he ex-perienced tremendous pain following his back injuries. As a result of his disc and spinal injuries, Hancock underwent surgery in June 1982. Hancock continued to experience pain, and he underwent a second surgical procedure in November 1983 for a ruptured disc. At the time of his injury, Hancock was twenty-nine years old, was married, and had two daughters. Although Hancock's medical condition has improved since he sustained his injuries, he continues to have permanent physical disabilities which limit his ability to engage in activities that he readily engaged in before his injury. He never returned to work for the Railway, and the testimony disclosed that his efforts to secure alternate employment met with discouraging results. Hancock's despondency over his injuries and inability to work led to a brief period of alcoholism, which Hancock ultimately overcame with the assistance of a therapist.

On October 14, 1983, Hancock commenced this negligence action against the Railway pursuant to the FELA. At the close of the five-day jury trial, the jury found in favor of Hancock and, in interrogatories, indicated that Hancock was not contributorily negligent. The jury returned a verdict for $1,510,000, consisting of "past economic losses" of $60,000 from the period March 4, 1982 to December 31, 1985, "future economic losses" of $850,000, and damages for pain and suffering in the amount of $600,000. The facts pertinent to the verdict will be discussed under the respective assignments of error. The Railway assigned four errors for this appeal:

"I. The trial court erred in failing to grant defendant's motion for directed verdict on the negligence of plaintiff as plaintiff's admissions established his contributory negligence as a matter of law.

"II. The trial court erred in deny-

ing defendant's motion for a new trial because the jury verdict for plaintiff's economic loss grossly exceeded the maximum amount stated in plaintiff's opening statement and testified to by plaintiff's economic expert.

"III. The trial court erred in denying defendant's motion for a new trial because plaintiff's evidence established that he was not totally and permanently disabled, yet the jury award greatly exceeded his total economic loss for life.

"IV. The trial court erred in denying defendant's motion for a new trial because the award was grossly excessive and shocks the conscience."

Before addressing the merits of the respective assignments of error, we note at the outset that an FELA action may be brought in federal court or in state court. Section 56, Title 45, U.S. Code. As a general matter, FELA cases adjudicated in state courts are subject to state procedural rules, but the substantive law governing them is federal. *St. Louis Southwestern Ry. Co.* v. *Dickerson* (1985), 470 U.S. 409, 411. Accord *Jones* v. *Erie RR. Co.* (1922), 106 Ohio St. 408,

140 N.E. 366. The Supreme Court has candidly acknowledged "the impossibility of laying down a precise rule to distinguish 'substance' from 'procedure.' " *Brown* v. *Western Ry. of Alabama* (1949), 338 U.S. 294, 296. Nevertheless, the instant appeal presents both questions of substance as well as questions of procedure, and the issues raised will be addressed accordingly.

I

Appellant's first assignment of error argues that the trial court erred in failing to grant the Railway's motion for a directed verdict on the issue of contributory negligence.[1] The assignment of error is not well-taken.

The appellant concedes that it was negligent. (Brief of appellant, at 3.) Appellant argues that Hancock was also negligent as a matter of law for attempting to lift the eighty-pound box of bolts and for failing to observe a company rule regarding proper lifting procedures. Appellant reasons that because of Hancock's contributory negligence, his recovery should have been diminished accordingly.[2] We do not agree.

---

[1] We are satisfied that appellant timely renewed its motion for a directed verdict on the issue of contributory negligence. See *Neiswender* v. *Edinger* (1978), 59 Ohio App. 2d 25, 13 O.O. 3d 96, 392 N.E. 2d 580. At the close of appellee's case in chief, appellant moved for a directed verdict, contending that "[i]t was only the activity of the [appellee] who violated a safety rule, who violated common sense * * *." We construe this to be an allegation that appellee was contributorily negligent. Subsequently, at the close of all the evidence, appellant renewed its motion for a directed verdict, contending that there was no evidence to show that appellant "negligently *and causally*" brought about appellee's injury. (Emphasis added.) We construe this to suggest that appellee's injuries were caused not by the

Railway's negligence but rather were caused by appellee's own alleged negligence. Thus, appellant successfully renewed its motion for a directed verdict for purposes of appellate review.

[2] Section 53, Title 45, U.S. Code provides in part: "In all actions [hereafter] brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee[.] * * *"

In ruling on a motion for a directed verdict, the trial court must construe the evidence most strongly in favor of the party against whom the motion is directed, and the motion may not be granted unless the court finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party. Civ. R. 50(A)(4). See *Bevan* v. *New York, Chicago & St. Louis Rd. Co.* (1937), 132 Ohio St. 245, 7 O.O. 546, 6 N.E. 2d 982. To find contributory negligence as a matter of law under the circumstances of this case, it would be necessary to find that appellee Hancock failed to exercise ordinary care and prudence in performing his work-related duties. If, construing the evidence most strongly in favor of Hancock, reasonable minds can differ as to whether Hancock failed to exercise reasonable care for his own safety, then the issue of Hancock's alleged contributory negligence should be submitted to the jury. See *Perry* v. *Eastgreen Realty Co.* (1977), 55 Ohio App. 2d 130, 132, 9 O.O. 3d 277, 278, 379 N.E. 2d 599, 600.

Viewing the evidence in this light, we believe reasonable minds could differ as to whether Hancock failed to exercise ordinary care under the circumstances of this case. The testimony disclosed that Hancock's predecessor demonstrated the manner in which boxes were transferred from the forklift to the scaffold. The employees testified that they regularly transferred the boxes in the same or similar manner. Moreover, the employer's supervisors regularly patrolled the assembly line area without ever cautioning the employees as to the manner of moving the boxes and, thus, tacitly approved the employees' methods. Finally, even after Hancock's injury, Fred Bond continued to lift the boxes in the same manner, with Railway supervisors nearby as they observed Hancock being lowered from the scaffold. Under these facts, it cannot be said as a matter of law that Hancock failed to exercise ordinary care or reasonable prudence.

Appellant argues that Hancock's failure to observe a safety rule promulgated by the Railway establishes Hancock's contributory negligence as a matter of law. The rule states:

"When lifting, have secure footing, bend knees, keep back erect and maintain a firm grip on the object."

Appellant contends Hancock's act of bending over the hand rail to lift the box is a violation of the rule and demonstrates contributory negligence as a matter of law. Appellant's contention is not persuasive.

The violation of a company rule does not constitute contributory negligence as a matter of law, and it is for the jury to determine whether a violation of such rule is a proximate cause which contributed in part or in whole to the injury. See *Wehrli* v. *Wabash RR. Co.* (Mo. 1958), 315 S.W. 2d 765, 775, certiorari denied (1959), 358 U.S. 932; *Teets* v. *Chicago, South Shore & South Bend RR.* (C.A. 7, 1956), 238 F. 2d 223, 226. In the case *sub judice,* the record reveals that Hancock was merely following the customary practice in picking up boxes. Furthermore, given the awkward and confined working conditions, it is by no means certain that Hancock could safely secure his feet, bend his knees, and lift the box in the idealized manner envisioned by the safety rule. We also note that this rule is different in kind from rules involving specific employee conduct, such as safe speeds to travel while in the workplace. See, *e.g., Atchison, T. & S. F. Ry. Co.* v. *Ballard* (C.A. 5, 1940), 108 F. 2d 768; *Pennsylvania Co.* v. *Wasson* (1914), 3 Ohio App. 458, 21 Ohio C.C. (N.S.) 481. Finally, appellant joined appellee in

submitting jury instructions which noted that the Railway's rules do not provide conclusive proof of contributory negligence, and no objection was made to the giving of said instructions. See Civ. R. 51(A).

Under these circumstances, we conclude that the court correctly submitted the issues of Hancock's alleged contributory negligence to the jury. Accordingly, the court properly denied appellant's motions for a directed verdict.

The first assignment of error is without merit.

## II

Appellant's second assignment of error contends that the trial court erred in not granting the Railway's motion for a new trial when the jury's verdict exceeded the amount of economic loss estimated by Hancock's counsel in opening remarks and where the verdict did not take into consideration the effect of federal income taxes on Hancock's recovery. This contention is not well-taken.

The granting of a motion for a new trial rests in the sound discretion of the trial court, and the court's ruling will not be disturbed on appeal unless there has been an abuse of discretion. See *Poske* v. *Mergl* (1959), 169 Ohio St. 70, 8 O.O. 2d 36, 157 N.E. 2d 344; *Verbon* v. *Pennese* (1982), 7 Ohio App. 3d 182, 7 OBR 229, 454 N.E. 2d 976. Where a jury verdict is supported by substantial competent, credible evidence, it is an abuse of discretion to grant a motion for a new trial.

Appellant initially argues that the estimates of Hancock's future economic losses, as stated in counsel's opening remarks, constitute "admissions" which accordingly limit Hancock's recovery. Appellant's conten-

tion is not persuasive. Counsel is accorded broad latitude in opening statements. See *Maggio* v. *Cleveland* (1949), 151 Ohio St. 136, 38 O.O. 578, 84 N.E. 2d 912. Such generalized remarks cannot be construed as "admissions" unless it is apparent that the plaintiff will not be able to establish an actionable claim against the defendant.[3]

In the instant case, Hancock's counsel estimated Hancock's future economic losses to be in the range from $500,000 to $800,000. The evidence adduced at trial established that as a result of his injuries Hancock would be functionally unemployable. Dr. Harvey S. Rosen, a qualified expert, estimated the "stream of income" lost by Hancock as a consequence of his back injury. See, generally, *St. Louis Southwestern Ry. Co.* v. *Dickerson, supra* (verdict must reflect present value of future losses); *Jones & Laughlin Steel Corp.* v. *Pfeifer* (1983), 462 U.S. 523 (recommended calculation for lost stream of income).

Rosen estimated that from the date of his injury until the end of 1985, Hancock incurred "past economic losses" in the amount of $60,375. Rosen further testified that as a result of his inability to obtain employment at a comparable pay scale, Hancock would also sustain "future economic losses" in the amount of $842,020. Rosen stated that Hancock's *total* economic losses in the amount of $902,395 would incur federal tax liabilities in the amount of $98,835. Accordingly, Hancock's net wage loss amounted to $803,537.

Under these circumstances, we do not believe that Hancock's counsel exceeded the broad latitude afforded in his opening remarks. The estimate can in no way be construed to suggest an

[3] The amount of recoverable damages may be limited by Civ. R. 54(C). See *Douthitt* v. *Garrison* (1981), 3 Ohio App. 3d 254, 3 OBR 286, 444 N.E. 2d 1068.

absence of liability on the part of the Railway. Accordingly, it was not error to deny appellant's motion for a new trial on this ground.

However, we also believe that a remittitur is in order in the instant case. In its answers to the interrogatories, the jury indicated that it awarded Hancock $60,000 for past economic losses and $850,000 for future economic losses, for a total of $910,000 in economic losses. Although these figures closely track the amount of economic losses estimated by Rosen, they do not include the impact of income tax liabilities which Dr. Rosen estimated to be in the amount of $98,835, which, when subtracted, would establish Hancock's net wage losses.

We do not agree with appellant's claim that this mathematical error establishes that the jury's verdict was the result of "passion or prejudice." We also do not accept appellant's contention that the decision of *Norfolk & Western Ry. Co.* v. *Liepelt* (1980), 444 U.S. 490, commands nothing less than a new trial for the jury's mathematical error. In *Liepelt,* the court held that evidence of the impact of income taxes on an employee's future earnings is admissible and that the jury should be instructed that a damages award in an FELA action is not subject to federal income taxes. In the instant case, the jury was so instructed, and Rosen testified as to the impact of income taxes on Hancock's future earnings. The record suggests that the jury merely neglected to subtract said income tax liabilities from its verdict.

We believe that the jury's failure to make an adjustment for Hancock's income tax liabilities artificially inflated the judgment. Hancock acknowledges that a remittitur is the appropriate modification in this matter. See *Union Pac. RR. Co.* v. *Hadley* (1918), 246 U.S. 330; *Bartlebaugh* v. *Pennsylvania Rd. Co.* (1948), 150 Ohio St. 387, 38 O.O. 237, 82 N.E. 2d 853. Accord-

ingly, if the appellee consents to a remittitur of $98,835 to reflect the impact of federal income taxes, the judgment will be affirmed as modified. Appellee shall file his consent to a remittitur with the clerk of this court within twenty days from the date that this journal entry and opinion is journalized.

The second assigment of error is without merit.

### III

Appellant's third assignment of error submits that a new trial should have been granted where the jury's award of future economic losses suggested a finding of total incapacity with regard to Hancock's prospects for future employment. Appellant argues that the evidence suggested that Hancock would be capable of some employment activities and, thus, that the jury's award is not supported by the evidence. Appellant's contention is without merit.

As noted in the preceding discussion, the decision to grant a new trial rests within the sound discretion of the trial court, and it is an abuse of discretion to grant a motion for a new trial where the jury verdict is supported by substantial, competent, credible evidence. See *Poske* v. *Mergl, supra; Verbon* v. *Pennese, supra.* See, also, *C. E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578. An appellate court may not substitute its judgment for that of the trier of fact where the trier of fact's conclusion is supported by evidence of record.

In the instant case, Rosen provided the jury with three estimates of Hancock's future economic losses, which varied based upon the prospects of future employment for Hancock. If Hancock were unable to secure and retain future employment as a result of his disabilities and other physical restrictions, Rosen estimated Hancock's

losses for the remainder of his work life expectancy to be in the amount of $842,020. When added to Hancock's past economic losses and adjusted for income taxes, Rosen estimated Hancock's net wage losses to be in the amount of $803,537. Rosen's second forecast assumed that Hancock would be able to secure employment at the minimum wage, or $3.35 per hour. After making similar adjustments, Rosen estimated Hancock's net wage loss to be in the amount of $609,896. Under the third forecast, Rosen assumed that Hancock would be able to secure employment paying $5 per hour, or less than one half of what Hancock earned while employed with the Railway. Under this model, Hancock's net wage loss amounted to $520,480.

Given these scenarios, the jury concluded that Hancock would be incapable of securing and retaining employment in the future as a consequence of his injuries. Thus, the issue raised in this assignment is whether the jury's determination of Hancock's total inability to work in the future is supported by competent, credible evidence. Our review of the record convinces us that the jury's determination is supported by the evidence and that the trial court did not abuse its discretion in refusing to disturb the jury's verdict.

Several witnesses testified regarding Hancock's prospects for future employment. Dr. Robert S. Widmeyer, Hancock's physician, appeared by video deposition and testified that the restrictions on Hancock's physical activities would be permanent, but that they would vary in degree in future years. Widmeyer believed that Hancock would probably be able to do more in the future, but stated that Hancock could not engage in heavy lifting, bending, or other prolonged repetitive activities such as sitting or standing in one position for an extended period of time. Widmeyer opined that the best therapy for Hancock would be for Hancock to find a useful way to earn a living within his physical capabilities. Widmeyer indicated that a position as a meter reader would be an example of Hancock's realistic prospects for employment.

Two vocational rehabilitation counselors also testified concerning Hancock's prospects for future employment. John L. Campbell testified that after meeting Hancock in July 1984, he attempted to assist Hancock in obtaining employment. In addition to the limitations placed upon Hancock's physical activities as a result of his injuries, Campbell testified that Hancock did not have any transferable skills. Hancock's primary skills involved manual labor, and Campbell determined that employment involving complex matters was not a realistic prospect. As a consequence of these limitations, Campbell testified that Hancock's employability was "very limited." Campbell stated that employment, if any, would have to consist of "light work," such as a parking lot attendant or cashier. If Hancock were successful at obtaining employment, he could expect to earn at best the minimum wage, with the possibility of earning between $5 per hour and $6 per hour after a time.

Richard L. Mullins, a Virginia rehabilitation counselor, also appeared by video deposition. Mullins stated that he recommended that Hancock seek "light assembly work" involving matters that were not particularly technical. Mullins did not recommend retraining. Notwithstanding Hancock's inability to lift, bend, strain or stand in one place, Mullins remained optimistic about Hancock's prospects for employment. Mullins stated that Hancock might work as a meter reader or cook's helper, although he acknowledged that the primary employment in Virginia involved wood products and textiles.

Mullins indicated that Hancock would earn the minimum wage, with a possible increase at some point in the future. Mullins noted that although Hancock had been unable to find employment, he remained very cooperative.

Finally, Hancock testified as to his efforts to obtain employment following his injuries. In accordance with Mullins' directions, Hancock submitted employment applications at numerous places of employment in Virginia, including appliance stores, drug stores, department stores, grocery stores, cinemas and the like. Hancock was unable to secure employment. He also enrolled at a community college for a course on electronics, but, by the close of trial, Hancock learned that his application had not been accepted at a Virginia electronics store. Hancock did obtain one employment position prior to trial, but he was constrained to resign when the cost of the long-distance travel exceeded the income earned for his nine hours of employment per week.

In light of this evidence, we cannot say that the jury erred in concluding that Hancock's prospects for future employment were grim. We agree with appellant that an award of damages for lost earnings should be a rough approximation to compensate the worker for the diminution in the worker's lost stream of income. See *Jones & Laughlin Steel Corp.* v. *Pfeifer, supra.* However, where re-employment is not a realistic possibility, it may not be appropriate for the trier of fact to reduce a plaintiff's damage award to reflect what the employee *could* earn, as opposed to what the employee *would* earn, if employment hypothetically became available. The trial court has the primary responsibility of examining the amount of the jury's verdict since the trial court is more familiar with the

evidence than is the appellate court and thus is in a better position to check a jury which has "lost its head." This record contains substantial evidence to support the jury's determination that the physical limitations placed upon Hancock as a result of his injury and the practical restrictions imposed upon him in terms of employment opportunities have substantially limited Hancock's ability to secure and retain employment. We are also mindful of the practical reality that employers may be wary of hiring an employee such as Hancock who already suffers from permanent physical injuries. See, *e.g., Grunenthal* v. *Long Island Rail Road Co.* (1968), 393 U.S. 156, 161.

Under these circumstances, we do not believe that it is appropriate to substitute our judgment of the evidence for the judgment of the jury. Contrast *Morgan* v. *Consolidated Rail Corp.* (S.D. N.Y. 1980), 509 F. Supp. 281 (award for lost earnings shocked court's conscience where there was no evidence to suggest that injured employee was not employable elsewhere); and *Monaghan* v. *Uiterwyk Lines, Ltd.* (E.D. Pa. 1985), 607 F. Supp. 1020 (evidence showed employee was capable of additional work). Accordingly, we conclude that the court did not err in denying appellant's motion for a new trial under the circumstances of this case.

The third assignment of error is not well-taken.

IV

Appellant's fourth assignment of error contends that the trial court abused its discretion by not granting a new trial where the jury's verdict was grossly excessive and shocking to the conscience. We do not agree.

We note at the outset that questions concerning the measure of damages in an FELA action are federal in

character and must be settled according to general principles of law as administered in the federal courts even though the action is brought in state court. See *Norfolk & Western Ry. Co.* v. *Liepelt, supra.* However, it has been recognized that state law governs with respect to the reviewability of questions of the excessiveness of damages awarded in an FELA action when the action is brought in a state court. See *Vivian* v. *Atchison, Topeka & Santa Fe Ry. Co.* (1961), 69 N.M. 6, 363 P. 2d 620. See, generally, Annotation, Applicability of state practice and procedure in Federal Employers' Liability Act actions brought in state courts (1961), 79 A.L.R. 2d 553, 568-569. In any event, the authorities are in agreement that in an action for damages for personal injury, a jury's verdict should not be set aside unless the damages awarded are so excessive as to appear to have been awarded as a result of passion or prejudice or unless · it is manifestly against the weight of the evidence. *Toledo, Columbus & Ohio River RR. Co.* v. *Miller* (1923), 108 Ohio St. 388, 140 N.E. 617; *Litchfield* v. *Morris* (1985), 25 Ohio App. 3d 42, 25 OBR 115, 495 N.E. 2d 462. Accord *Metcalfe* v. *Atchison, Topeka & Sante Fe Ry. Co.* (C.A. 10, 1974), 491 F. 2d 892, 898 (jury's determination of fact in FELA action is considered inviolate unless award is so excessive as to shock judicial conscience and raise irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial). "We appellate judges are not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand." *Grunenthal* v. *Long Island Rail Road Co., supra,* at 159 (quoting *Dagnello* v. *Long Island Rail Rd. Co.* [C.A. 2, 1961], 289 F. 2d 797, 806).

In the case *sub judice,* appellant argues that the verdict was not supported by the evidence and, thus, was the result of passion or prejudice. From our review of the record, as discussed elsewhere in this opinion, we cannot agree with appellant's contention. Hancock's past economic losses are supported by the record. We also conclude that the record supports the jury's finding of future economic losses as a result of Hancock's injury. Finally, considerable testimony was adduced to establish Hancock's pain and suffering as a result of his changed circumstances following the injury. Under these facts, we do not perceive any passion or prejudice which would warrant substituting our view of the evidence for that of the jury. We also cannot say that the trial court's refusal to set aside the verdict constitutes a denial of justice under these circumstances.

Appellant also attempts to establish passion or prejudice by comparing this jury award with other allegedly comparable injuries. In *Thompson* v. *National Railroad Passenger Corp.* (C.A. 6, 1980), 621 F. 2d 814, 827, the court listed as factors in reviewing jury awards: (1) awards in other cases; (2) the nature and extent of the injuries; (3) suffering; (4) expenses; (5) diminution of earning capacity; (6) inflation and high cost of living; (7) age; and (8) expectancy of life. "But the cases involving similar injuries are in no sense controlling." *Id.* In this case, we are not prepared to limit our review to a color-matching of cases in order to compare the size of the respective verdicts. Each case must be viewed in light of its own particular facts. In the case *sub judice,* Hancock's injuries are of a permanent nature and have substantially diminished his ability to engage in physical activities. Sustaining his injury at age twenty-nine, he will continue to experience the effects of his injury, and the injury has pre-

maturely terminated his ability to engage in comparable employment. Even if Hancock's condition could be characterized as "average" for this type of injury, that does not lessen the debilitating effect of the injury.

Appellant further argues that the verdict unjustly enriches Hancock since an investment of the jury award could plausibly yield a return in excess of that to which Hancock is entitled. Appellant attempted to introduce evidence to this effect through witness James Tekavec, but the jury was not persuaded. We agree. Rosen's computations of Hancock's future lost earnings were reduced to their present value. See *St. Louis Southwestern Ry. Co.* v. *Dickerson, supra*. This adjustment corrected the potential for speculative damages. Rosen explained that while Hancock's income in the year 2011 was projected to be $41,000 before taxes, Hancock's real earnings would be $23,237.64 when adjusted for present value. Under these circumstances, we cannot say that the jury erred in accepting Rosen's projections or that Hancock would be unjustly enriched as a result.

Appellant next argues that Rosen's gratuitous comment that the Railway made $456,000,000 in profits in the preceding year was prejudicial. We do not believe that this comment rises to the level of misconduct censured in *Cleveland* v. *Peter Kiewit Sons' Co.* (C.A. 6, 1980), 624 F. 2d 749, wherein there were repeated references to the wealth of one of the parties. See, also, *Hudock* v. *Youngstown Mun. Ry. Co.* (1956), 164 Ohio St. 493, 58 O.O. 345, 132 N.E. 2d 108. In the case *sub judice,* Rosen's isolated comment came following appellant's cross-examination of Rosen, which attempted to suggest that economic forces could tend to limit the railroad's expansion and ability to maintain a constant labor force. In addition, appellant's objection was sustained following Rosen's remark, and the jury was promptly instructed to disregard Rosen's remark. Under these circumstances, we do not believe that Rosen's comment so inflamed the jury as to create a reasonable probability that the verdict was a result of passion or prejudice.

Finally, appellant suggests that alleged speculation by the jury as to why the case was being heard in Cleveland as opposed to Virginia manifested that the jury was affected by passion or prejudice. The record discloses that Clarence A. Bodnar, a claims agent for appellant, allegedly heard the jurors' speculation while out of the presence of the court or counsel. When the court and counsel returned to the court chambers, trial resumed, but Bodnar made no mention of the jurors' alleged speculation. No objection was registered as to the alleged speculation by the appellant, and the first reference to alleged irregularities did not occur until appellant filed its motion for a new trial, more than two weeks after the jury's verdict was returned. In light of the failure to disclose any alleged remarks during the course of the trial, at which time corrective instructions or other measures could have been taken, we cannot say that the court abused its discretion in denying appellant's motion for a new trial. Similarly, we are also unpersuaded that this allegation supports appellant's claim that the verdict was the result of passion or prejudice.

Accordingly, we conclude that appellant has failed to demonstrate that the jury's verdict was the result of passion or prejudice. It was not error to deny appellant's motion for a new trial.

The fourth assignment of error is without merit.

The judgment is affirmed if remittitur is consented to by appellee.

*Judgment accordingly.*

NAHRA, P.J., and ANN MCMANAMON, J., concur.