JOURNAL ENTRY AND OPINION
{¶ 1} This journal entry and opinion addresses five separate appeals and cross-appeals[1], which have been consolidated for review and disposition. MedLink of Ohio and Lexington Insurance Company each appeal the trial court' s decision awarding judgment in favor of Andrea Barnes. Barnes cross-appeals asserting several assignments of error. After a thorough review of all the arguments and for the reasons set forth below, we affirm the judgments of the trial court.
 PROCEDURAL HISTORY {¶ 2} On December 4, 2001, appellee, Andrea Barnes, filed a medical malpractice/wrongful death action against University Hospitals of Cleveland ("UH") and MedLink of Ohio ("MedLink"). Barnes sought compensatory damages on behalf of her daughter, Natalie Barnes, who died while undergoing kidney dialysis treatment. The complaint alleged that UH and MedLink violated the applicable standard of care owed to the decedent. UH and MedLink each served answers to Barnes' complaint denying liability. The parties proceeded with discovery.
 {¶ 3} After conducting discovery, the parties each determined that it would be in their best interest to submit the dispute to a retired judge for the purpose of conducting a jury trial. On April 18, 2005, each of the parties executed a court-approved agreement with respect to conducting the jury trial before a retired judge, and trial commenced on April 25, 2005. Prior to opening arguments, the presiding judge had the parties confirm on the record that they consented to his authority and waived any rights to challenge his jurisdiction on appeal.
 {¶ 4} The trial concluded on May 3, 2005. After deliberations, the jury awarded judgment in favor of Barnes, finding MedLink ninety percent liable and UH ten percent liable for Natalie' s death. The jury awarded Barnes $100,000 on her survivorship claim and $3,000,000 on the wrongful death claim. In addition, the jury unanimously concluded that MedLink acted with actual malice and awarded Barnes an additional $3,000,000 in punitive damages. On October 18, 2005, the trial court assessed attorney fees and litigation expenses in the amount of $1,013,460 against MedLink and entered a final judgment on the entire case in the amount of $6,803,460.
 {¶ 5} On March 7, 2006, MedLink filed an original action in prohibition with the Supreme Court of Ohio, arguing that the presiding judge lacked the proper qualifications to preside over the trial, thus, his involvement was unlawful. Barnes filed a motion to dismiss the prohibition; however, on April 28, 2006, before the court could rule on the motion, MedLink abandoned the prohibition action.
 UNDERLYING FACTS {¶ 6} The incident that gave rise to the present case occurred on October 19, 2000. On that day, decedent, Natalie Barnes, was undergoing routine kidney dialysis treatment at UH. Natalie was 24 years old at the time and suffered from both mental retardation and epilepsy. In 2000, Natalie developed kidney disease and began hemodialysis treatments at UH on a regular basis. During the dialysis treatment, blood was pumped out of her body into a device called an "artificial kidney." The artificial kidney would remove impurities from Natalie' s blood, and the blood would be returned to her body.
 {¶ 7} Many individuals who undergo ongoing kidney dialysis, including Natalie, require a device called a "perma cath," which is a catheter that is surgically implanted into the patient's chest to aid in the dialysis procedure. The perma cath consists of a flexible tube that is threaded through the skin into either the subclavian vein or the internal jugular vein, down to the heart. The patient's skin grows over a small cuff at the end of the perma cath, holding the device in place and preventing infection. Two ports in the perma cath remain open so they can be accessed for dialysis. After each dialysis treatment is completed, the exposed ends are capped to protect the patient.
 {¶ 8} One of the primary concerns during dialysis treatment utilizing a perma cath is that an air embolism can occur if there is an insecure connection with the catheter or if the catheter is removed from the body. An air embolism would cause air to enter the blood stream and travel into the ventricle of the heart. If this persists, the heart will stop, and the patient will go into cardiac arrest.
 {¶ 9} Because Barnes was aware of the dangers dialysis posed and her daughter' s tendency to pull at her catheter, she requested the services of a medical aide to sit with Natalie while she underwent dialysis treatment. These services were available to her daughter through the Cuyahoga County Board of Mental Retardation and Developmental Disabilities ("MRDD"). MRDD contracted with MedLink to provide home health care services for patients like Natalie who needed individual care.
 {¶ 10} On September 1, 2000, Cynthia Fribley and Mary Lynn Roberts, both supervisors for MRDD, met to discuss Natalie' s request for a medical aide. During the meeting, they were informed that Natalie had previously touched and attempted to pull at her catheter during dialysis. Fribley was instructed that she had to ensure that the MedLink aide would not leave Natalie' s side during dialysis.
 {¶ 11} MedLink aide, Ann Marie Lumpkin Vernon, was originally selected to sit with Natalie during her dialysis treatments. During a meeting at Barnes' home, Lumpkin was informed that Natalie had a tendency to touch and pull at her catheter, and she was instructed not to leave Natalie' s side during the dialysis treatments. Lumpkin successfully cared for Natalie as she underwent dialysis. When Natalie would attempt to touch or pull at her catheter, Lumpkin would distract her or gently remove her hand. If Lumpkin had to use the restroom, or otherwise excuse herself from the dialysis unit, she always ensured that a hospital staff member took her place and informed the staff member that Natalie was not to touch her catheter.
 {¶ 12} Lumpkin successfully accompanied Natalie during several dialysis treatments, but was later replaced by MedLink aide Endia Hill. Hill did not have the proper experience or background to work as a health care aide. She had previously been convicted of a felony and did not have a high school education, a minimum qualification for MedLink employment. Much like Lumpkin, Hill received strict instructions to sit with Natalie and prevent her from touching or attempting to pull at her catheter. She was also advised that Natalie had attempted to pull at her catheter in the past and needed to be closely monitored.
 {¶ 13} On October 19, 2000, Hill transported Natalie to UH for her dialysis treatment. Once Natalie' s catheter was attached to the dialysis equipment, Hill left the dialysis unit, went to the hospital cafeteria and then walked around the UH facility for several hours. UH hemodialysis technician, Charles Lagunzad, attended to Natalie once Hill left. During his testimony, Lagunzad stated that he was unaware whether Natalie had a medical aide with her or if she was even supposed to have an aide. At 1:30 p.m., Lagunzad went to lunch, leaving technician Larry Lawrence with Natalie. Although Lawrence was present in the dialysis unit, he had four other patients to attend to and could not give Natalie his full attention.
 {¶ 14} Lawrence testified that at around 1:34 p.m., he looked away from Natalie for several seconds, and she pulled her catheter out of her chest. Lawrence yelled for help, and Sue Blankschaen, administrative director of the UH dialysis program, reported to the dialysis center. As Blankschaen arrived, she saw the hole in Natalie' s chest and, after performing an assessment, determined that Natalie had a weak pulse and shallow breathing. Lawrence initiated CPR, which he performed with the help of another UH staff member. At 2:00 p.m., an emergency code was called, and a number of specialists responded to the dialysis unit to aid Natalie.
 {¶ 15} Natalie's medical chart indicates that she had suffered an air embolism, which caused cardiac arrest. As a result of the cardiac arrest, she was left severely brain damaged. After this incident, Natalie was unable to eat or breathe without life support. After several months, when Natalie' s condition failed to improve, Barnes decided to discontinue life support, and Natalie died.
 DISCUSSION {¶ 16} In the five separate appeals consolidated here for review and decision, there are a total of 16 assignments of error,[2] several of which are similar in nature. We will tailor our discussion accordingly and will address certain assignments of error together where it is appropriate.
 JURY'S VERDICT — PASSION AND PREJUDICE {¶ 17} MedLink cites two assignments of error[3] dealing with the jury's verdict. Because they are substantially interrelated, we address them together.
 {¶ 18} MedLink argues that the jury' s verdict was the product of passion and prejudice and was overwhelmingly disproportionate on the basis of the evidence. More specifically, it contends that the remarks of plaintiff' s counsel inflamed the jury and appealed to the jury' s sympathy and anger.
 {¶ 19} A new trial may be granted where a jury awards damages under the influence of passion and prejudice. Cox v. Oliver Machinery Co.
(1987), 41 Ohio App.3d 28; Jones v. Meinking (1987), 40 Ohio App.3d 45;Hancock v. Norfolk Western Ry. Co. (1987), 39 Ohio App.3d 77,529 N.E.2d 937; Litchfield v. Morris (1985), 25 Ohio App.3d 42. In a personal injury suit, a damage award should not be set aside unless the award is so excessive that it appears to be the result of passion and prejudice, or unless the award is so manifestly against the weight of the evidence that it appears that the jury misconceived its duty.Toledo, C. O.RR Co. v. Miller (1923), 108 Ohio St. 388,140 N.E.2d 617; Cox, supra; Litchfield, supra.
 {¶ 20} We do not agree with MedLink' s contention that the jury' s verdict was a product of passion and prejudice. We accept that plaintiff' s counsel discussed the facts of this case in detail and emphasized the heart wrenching nature of the events leading to Natalie' s death; however, we cannot ignore that the facts of this case, irrespective of plaintiff' s counsel, were incredibly devastating and tragic. MedLink argues that the jury' s verdict was swayed by passion and prejudice, but it fails to accept that the reality of the facts involved in this case, no matter how they were relayed to the jury, would insight passion.
 {¶ 21} The case involves a 24-year-old, mentally disabled and epileptic young woman who needed constant care while undergoing kidney dialysis. Despite the strict warnings her caretaker received, she left Natalie by herself, which resulted in Natalie's cardiac arrest and severe brain damage. After Natalie' s condition failed to improve, her mother was placed in the unenviable position of having to remove her daughter from life support.
 {¶ 22} Both Barnes and Natalie placed their faith in MedLink to provide attentive and constant care. The record clearly indicates that MedLink failed to provide that care, and its omission resulted in Natalie' s death. The jury' s three million dollar award was in no way shocking. A young woman lost her life, and a mother lost her daughter. Although MedLink argues that plaintiff' s counsel appealed to the jury' s sympathy and anger, it is clear that the facts of this case, standing alone, were enough to substantiate the jury' s verdict.
 {¶ 23} Accordingly, we do not find that the judgment awarded to Barnes was a product of passion and prejudice, and these assignments of error are overruled.
 REVERSIBLE ERROR — PUNITIVE DAMAGES {¶ 24} We next address MedLink's three assignments of error[4]
dealing with the court's instruction regarding punitive damages.
 {¶ 25} MedLink argues that the trial court committed reversible error when it instructed the jury regarding punitive damages. It asserts that plaintiff' s counsel failed to establish a nexus between hiring Hill and Natalie' s death. MedLink contends that because this nexus was never established at trial, plaintiff' s counsel failed to show actual malice on its part, making an instruction for punitive damages improper. MedLink concedes that it was negligent in hiring Hill, yet maintains it did not act with actual malice, a requirement for an award of punitive damages.
 {¶ 26} To constitute plain error, the error must be obvious on the record, palpable, and fundamental, so that it should have been apparent to the trial court without objection. See State v. Tichon (1995),102 Ohio App.3d 758, 767, 658 N.E.2d 16. Moreover, plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper actions. State v. Waddell (1996), 75 Ohio St.3d 163, 166,661 N.E.2d 1043. Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Phillips (1995), 74 Ohio St.3d 72, 83,656 N.E.2d 643.
 {¶ 27} In Ohio, an award of punitive damages cannot be awarded based on mere negligence, but requires actual malice as well. Actual malice is (1) that state of mind under which a person' s conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. Preston v. Murty (1987), 32 Ohio St.3d 334
at 336, 512 N.E.2d 1174. In fact, liability for punitive damages is reserved for particularly egregious cases involving deliberate malice or conscious, blatant wrongdoing, which is nearly certain to cause substantial harm. Spalding v. Coulson (Sep. 3, 1998), Cuyahoga App. Nos. 70524, 70538.
 {¶ 28} We find no merit in MedLink' s argument that the jury instruction regarding punitive damages violated its constitutional rights and constituted plain error. The record clearly indicates that plaintiff' s counsel established a strong nexus between MedLink' s hiring of Hill and Natalie' s injuries and subsequent death, establishing actual malice. Hill' s felony conviction made her ineligible for employment as a health care aide, and a high school diploma was a prerequisite for employment with MedLink. When MedLink hired Hill, it consciously disregarded the facts that she had a felony conviction and did not have a high school diploma. It is important to note that at no time did Hill conceal her felony conviction or her failure to complete high school from MedLink's administrators. Quite the contrary, Hill disclosed both her criminal history and educational background on her application for employment with MedLink.
 {¶ 29} MedLink' s actions were not only negligent, they also constituted actual malice. MedLink provides a service to patients who need individual medical care. Because of the vital nature of the services MedLink provides, it must hire employees who are highly qualified and responsible. When MedLink hired Hill, who did not even meet the minimum educational requirements and had previously been convicted of a felony, it consciously disregarded patient safety.
 {¶ 30} MedLink acted with actual malice when it hired Hill. Accordingly, the trial court did not commit plain error when it instructed the jury regarding punitive damages, and these assignments of error are overruled.
 {¶ 31} MedLink next argues that the trial court abused its discretion when it denied its motion to bifurcate issues regarding compensatory damages and punitive damages. It contends that in failing to separate the issues, the jury' s decision making process was tainted, resulting in an excessive award of damages.
 {¶ 32} To constitute an abuse of discretion, the ruling must be more than legal error; it must be unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 50 OBR 481,450 N.E.2d 1140.
 {¶ 33} "The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations." State v. Jenkins (1984), 15 Ohio St.3d 164, 222, quoting Spalding v. Spalding (1959), 355 Mich. 382, 384-385. In order to have an abuse of that choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." Id.
 {¶ 34} This court cannot accept MedLink' s assertion that the trial court abused its discretion when it denied the motion to bifurcate. Although MedLink argues that R.C. 2315.21(B) mandates that compensatory and punitive damages be bifurcated upon request, the trial court may exercise its discretion when ruling upon such a motion.
 {¶ 35} The issues surrounding compensatory damages and punitive damages in this case were closely intertwined. MedLink' s request to bifurcate would have resulted in two lengthy proceedings where essentially the same testimony given by the same witnesses would be presented. Knowing that bifurcation would require a tremendous amount of duplicate testimony, the presiding judge determined it was unwarranted.
 {¶ 36} The trial court' s actions were not unreasonable, arbitrary, or unconscionable when it denied MedLink' s motion for bifurcation. Accordingly, the trial court did not abuse its discretion, and this assignment of error is overruled.
 ATTORNEY FEES {¶ 37} Both MedLink and Barnes cited assignments of error dealing with the issue of attorney fees.[5] Because they are substantially interrelated, they will be addressed together.
 {¶ 38} Medlink argues that the trial court abused its discretion when it awarded attorney fees. Specifically, it asserts that the trial court failed to consider the contingency agreement that was entered into by Barnes when it calculated attorney fees. MedLink asserts that the contingency fee agreement executed between Barnes and her counsel should have limited the overall attorney fees.
 {¶ 39} On the other hand, Barnes argues that the trial court abused its discretion in calculating attorney fees because it failed to consider the original contingency fee agreement and instead based attorney fees on an hourly rate and lodestar multiplier.
 {¶ 40} We do not agree with either of these arguments. Barnes submitted documentation supporting attorney fees in the amount of $4,239,900. The presiding judge conducted an evidentiary hearing, where a substantial amount of evidence was presented regarding the total fees. He carefully evaluated the difficulty of this case, the cost of representation, and the time and diligence exerted by counsel on behalf of the plaintiff. After a thorough evaluation, the presiding judge determined that an award of fees in the amount of $1,013,460 was fair and appropriate.
 {¶ 41} Because of the extremely complex nature of this wrongful death/medical malpractice action, it required significant time and resources to litigate. Medical experts and reports were necessary, in addition to extensive research. It is well accepted that the trial court may exercise its discretion in the calculation of attorney fees. When considering the time and resources expended to properly litigate this case, it is clear that the trial court' s actions were not unreasonable, arbitrary, or unconscionable when it awarded attorney fees to Barnes in the amount of $1,013,460.
 {¶ 42} Accordingly, we do not find that the trial court abused its discretion in calculating attorney fees, and these assignments of error are overruled.
 INTERVENTION OF LEXINGTON {¶ 43} Lexington Insurance Company ("Lexington"), MedLink' s insurer, cites two assignments of error[6] dealing with its motion to intervene. Because they are substantially interrelated, they will be addressed together.
 {¶ 44} Lexington argues that the trial court abused its discretion when it denied its motion for intervention. Specifically, Lexington asserts that pursuant to Civ.R. 24(A), it meets all of the requirements for intervention of right, thus, it is entitled to intervene.
 {¶ 45} Civ.R. 24 provides in pertinent part:
 {¶ 46} "(A) Intervention of Right — Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of this state confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction that is the subject of the action and the appellant is so situated that the disposition of the action may as a practical matter impair or impede the applicant' s ability to protect that interest, unless the applicant' s interest is adequately represented by existing parties.
 {¶ 47} "(B) Permissive Intervention-Upon timely application anyone may be permitted to intervene in an action:(1) when a statute of this state confers a conditional right to intervene; or (2) when an applicant' s claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.
 {¶ 48} "(C) Procedure-A person desiring to intervene shall serve a motion to intervene upon the parties as provided in Civ.R. 5. The motion and any supporting memorandum shall state the grounds for intervention and shall be accompanied by a pleading, as defined in Civ.R. 7(A), setting forth the claim or defense for which intervention is sought. The same procedure shall be followed when a statute of this state gives a right to intervene."
 {¶ 49} We find no merit in Lexington' s contention that it was in full compliance with Civ.R. 24 when it submitted its motion for intervention to the court. First, Lexington' s motion was untimely. Lexington waited until one business day prior to the prejudgment interest hearing to file its motion for intervention. This is clearly untimely considering that the bulk of the litigation had been completed by that time. The presiding judge was fully aware that permitting Lexington to intervene at such a late stage in the litigation would disrupt the proceedings considerably. Lexington received adequate notice of the action at the time it was filed, giving it ample opportunity to intervene. Civ.R. 24(A) requires that for intervention of right, a motion must be timely. The fact that Lexington waited until the prejudgment interest proceedings to intervene evidences its untimeliness.
 {¶ 50} In addition, Lexington failed to establish that it had a legally recognized interest in the prejudgment interest proceedings. Civ.R. 24(A) requires that for an intervention of right, a party must make a showing that it cannot adequately protect its interest without intervening in the action. Lexington failed to meet this burden.
 {¶ 51} When comparing the arguments of MedLink in this case to those of Lexington, it is clear that they are closely aligned. Accordingly, Lexington' s interests were adequately represented by MedLink, making intervention unnecessary.
 {¶ 52} Lastly, Lexington failed to submit a proposed pleading with its motion to intervene, in violation of Civ.R. 24(C). Rule 24(C) specifically provides that a motion for intervention shall be accompanied by a pleading, as defined in Civ.R. 7(A), setting forth the claim or defense for which intervention is sought. When Lexington submitted its motion for intervention to the court, it neglected to include a proposed pleading. Although it later offered to submit the pleading, the trial court ruled that the motion was denied on the basis that it was untimely. Although the motion was denied on valid grounds, it is important to note that Lexington failed to file the appropriate documentation when submitting its motion for intervention to the court.
 {¶ 53} We do not find that the trial court' s decision was unreasonable, arbitrary, or unconscionable when it denied Lexington' s motion for intervention. Accordingly, the trial court did not abuse its discretion, and these assignments of error are overruled.
 SUBJECT MATTER JURISDICTION OF TRIAL JUDGE {¶ 54} Assignments of error dealing with subject matter jurisdiction of the trial judge were included in three of the five appeals.[7]
 {¶ 55} MedLink argues that the presiding judge did not have subject matter jurisdiction to hear the case. More specifically, it asserts that Judge Glickman did not have jurisdiction because during his original tenure as a judge he was appointed and not elected, as required by R.C.2701.10. Lexington presents the same argument as that asserted by MedLink.
 {¶ 56} R.C. 2701.10 provides in pertinent part:
 {¶ 57} "(A) Any voluntarily retired judge, or any judge who is retired under Section 6 of Article IV, Ohio Constitution, may register with the clerk of any court of common pleas, municipal court, or county court for the purpose of receiving referrals for adjudication of civil actions or proceeding, and submissions for determination of specific issues or questions of fact or law in any civil action or preceding pending in court. There is no limitation upon the number, type, or location of courts with which a retired judge may register under this division. Upon registration with the clerk of any court under this division, the retired judge is eligible to receive referrals and submissions from that court, in accordance with this section. Each court of common pleas, municipal court, and county court shall maintain an index of all retired judges who have registered with the clerk of that court pursuant to this division and shall make the index available to any person, upon request."
 {¶ 58} R.C. 2701.10 clearly does not differentiate between retired judges who were elected and retired judges who were appointed. When evaluating R.C. 2701.10 in its entirety, it is completely void of any language mandating that in order to serve as a retired judge you must have been elected rather than appointed.
 {¶ 59} MedLink also argues that Article IV, section six, of the Ohio Constitution requires that a judge be elected in order to serve as a retired judge. After a thorough review, this court concludes that the Ohio Constitution does not impose such a restriction.
 {¶ 60} Furthermore, on April 18, 2005, before the trial commenced, all parties to the litigation signed a court-approved agreement with respect to the presiding judge' s jurisdiction over the matter. Similarly, on the day of trial, the presiding judge had each of the parties state on the record that they consented to his authority and waived any rights to contest his jurisdiction on appeal. The fact that MedLink and Lexington now challenge the presiding judge' s jurisdiction does not ignore the fact that, at trial, they both effectively waived their right to do so. They cannot now seek to question the presiding judge' s authority because they did not receive their desired outcome.
 {¶ 61} Accordingly, we find that Judge Glickman did have proper jurisdiction to preside over the trial, and these assignments of error are overruled.
 PRE-JUDGMENT INTEREST {¶ 62} Assignments of error dealing with pre-judgment interest were included in three of the five appeals.[8]
 {¶ 63} Barnes first argues that the trial court abused its discretion when it barred her from discovering reports and information that MedLink obtained from a non-testifying expert prior to trial. More specifically, she asserts that the information was necessary to her defense to prejudgment interest. Barnes contends that Civ.R. 26(B)(4)(a) provides that such discovery is permissible.
 {¶ 64} We do not agree that the trial court abused its discretion when it prevented her from discovering certain reports and information. Civ.R. 26(B)(4)(a) specifically provides:
 {¶ 65} "Subject to the provisions of subdivision (B)(4)(b) of this rule 35(B), a party may discover facts known or opinions held by an expert retained or specially employed by another party seeking discovery if unable without undue hardship to obtain facts and opinions on the same subject by other means or upon showing other exceptional circumstances indicating that denial of discovery would cause manifest injustice."
 {¶ 66} Barnes is correct in her contention that she is entitled to discovery of an expert witness retained or specially employed; however, the information Barnes sought to discover was from a medical expert that was never retained or employed by MedLink. MedLink merely consulted with the medical expert when it was developing its trial strategy. The expert never testified and never even created or submitted a report to MedLink. The expert witness had so little involvement in the preparation of MedLink' s defense that his or her name was never even disclosed during the prejudgment interest hearing.
 {¶ 67} The trial court' s actions were not unreasonable, arbitrary, or unconscionable when it prevented Barnes from discovering information from the undisclosed medical expert. Accordingly, the trial court did not abuse its discretion, and this assignment of error is overruled.
 {¶ 68} Barnes next argues that the trial court abused its discretion in calculating prejudgment interest. She asserts that interest was calculated from the date the complaint was filed, rather than from the date the cause of action accrued, in direct violation of R.C.1343.03(C)(1)(c)(ii) as it existed at the time the original complaint was filed. She contends that the trial court' s application of the current version of R.C. 134.03(C)(1)(c)(ii), which calculates interest from the date the action was filed, constitutes a retroactive application and is thus prohibited.
 {¶ 69} We do not agree with Barnes' argument that the trial court erred when it calculated prejudgment interest from the date of the original filing rather than from the date that the incident occurred. The current version of R.C. 1343.03(C)(1)(c)(ii) specifically provides:
 {¶ 70} "(C) If, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case, interest on the judgment, decree, or order shall be computed as follows:
 {¶ 71} "* * *
 {¶ 72} "(c) In all other actions for the longer of the following periods:
 {¶ 73} "* * *
 {¶ 74} "(ii) From the date on which the party to whom the money is to be paid filed the pleading on which the judgment, decree, or order was based to the date on which the judgment, decree, or order was rendered."
 {¶ 75} The language of the statute clearly supports the trial court' s decision to calculate prejudgment interest from the date the action was filed. Although this statute was enacted after the suit was originally filed, it was in place before the prejudgment interest determination hearing was conducted, thus, it is applicable. The trial court' s actions did not constitute a retroactive application because the current version of the statute was firmly in place before prejudgment interest was evaluated.
 {¶ 76} We do not find that the trial court' s actions were unreasonable, arbitrary, or unconscionable when it calculated prejudgment interest from the date the action was filed rather than from the date the incident occurred. Accordingly, the trial court did not abuse its discretion, and this assignment of error is overruled.
 {¶ 77} Barnes next argues that the trial court abused its discretion when it excluded attorney fees from the calculation of prejudgment interest. Specifically, she asserts that such additional compensation is viewed as purely compensatory and should be included in the prejudgment interest calculation.
 {¶ 78} We do not agree. Attorney fees are future damages and, as such, are not subject to prejudgment interest. R.C. 1343.03(C)(2) states:
 {¶ 79} "No court shall award interest under division (C)(1) of this section on future damages, as defined in section 2323.56 of the Revised Code that are found by the finder of fact."
 {¶ 80} R.C. 2323.56 defines future damages as "* * * any damages that result from an injury to a person that is a subject of a tort action and that will accrue after the verdict or determination of liability by the trier of fact is rendered in that tort action."
 {¶ 81} It is clear from the mandate of R.C. 1343.03(C)(2) and the definition provided by R.C. 2323.56 that attorney fees constitute future damages and are not subject to prejudgment interest. The trial court' s actions were not unreasonable, arbitrary, or unconscionable when it failed to include attorney fees in the calculation of prejudgment interest. Accordingly, the trial court did not abuse its discretion, and this assignment of error is overruled.
 {¶ 82} In its appeal, MedLink argues that the trial court abused its discretion when it awarded prejudgment interest in favor of Barnes. More specifically, MedLink asserts that Barnes did not satisfy her burden to show that MedLink did not make a good faith effort to settle the case, pursuant to R.C. 1343.03(C). We find no merit in MedLink' s argument that it made a good faith effort to settle the present case. MedLink argues that it made a good faith effort to settle when it offered Barnes $400,000; however, that offer was only extended after a jury had been selected and the trial was underway. In addition, the $400,000 MedLink offered Barnes was significantly lower than the jury award. MedLink was fully aware that there was a grave possibility the jury would return a verdict in favor of Barnes. Not only was there strong evidence to sustain the position that MedLink's negligence proximately caused Natalie' s death, but there was also evidence supporting an award for punitive damages.
 {¶ 83} When evaluating the nature of this case and the truly devastating circumstances surrounding Natalie' s death, MedLink' s offer of $400,000 did not constitute a good faith effort to settle. The trial court' s actions were not unreasonable, arbitrary, or unconscionable when it awarded prejudgment interest to Barnes. Accordingly, the trial court did not abuse its discretion, and this assignment of error is overruled.
 CONCLUSION {¶ 84} Following a thorough review of the record, the briefs, and the arguments of all parties, we find no merit in any of the assignments of error and ultimately affirm the judgments of the trial court.
Judgment affirmed.
It is ordered that plaintiffs-appellees/cross-appellants recover from defendants-appellants/cross-appellees the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., PRESIDING JUDGE
JAMES J. SWEENEY, J., and ANTHONY O. CALABRESE, JR., J., CONCUR
 APPENDIX A Case Nos. 87247 and 87285: Appellant MedLink's Assignments of Error:
I. The jury's verdict was a product of passion and prejudice and was so overwhelmingly disproportionate as to shock reasonable sensibilities.
II. The judgment is contrary to the law on punitive damages and violates appellants' constitutional rights.
III. Reversible errors of law occurred at trial and were not corrected by the trial court.
IV. The trial court erred in denying Appellant's Motion To Separate Plaintiff's Claim For Punitive Damages.
V. The judgment is against the weight of the evidence.
VI. The trial court erred in its award and calculation of attorney's fees.
VII. Judge Glickman Did Not Have Subject Matter Jurisdiction To Hear This Case.
Appellee Barnes' Cross-Assignment of Error:
VIII. The trial judge abused his discretion by failing to consider and award attorney fees based upon the contingency agreement that had been entered with the client.
Case No. 87903:
 Appellant Barnes' Assignments of Error:
I. The trial judge misconstrued the applicable privilege and unjustifiably refused to allow plaintiff-appellants to discover reports and information that defendant-appellees had obtained prior to trail that were necessary to contest their defense to pre-judgment interest. [Prejudgment interest hearing transcript of January 31, 2006, pp. 328-341.]
II. The trial judge erred, as a matter of law, by calculating the award of prejudgment interest from the date the complaint was filed, December 4, 2001, instead of the date the case (sic) of action accrued, October 19, 2000. [Final Order of May 17, 2005.]
III. The trial judge erred, as a matter of law, in failing to include the award of attorney's fees in the calculation of pre-judgment interest. [Final Order of May 17, 2005.]
Case No. 87946:
 Appellant MedLink's Assignments of Error:
I. The trial court erred in awarding prejudgment interest to Plaintiff.
II. Robert T. Glickman did not have subject matter jurisdiction to decide Plaintiff's Motion for Prejudgment Interest.
Case No. 87710:
 Appellant Lexington Insurance Co.'s Assignments of Error:
I. Lexington Insurance Company ("Lexington") is entitled to intervention of right to oppose the motion for prejudgment interest filed by plaintiff, Andrea Barnes.
II. Judge Robert T. Glickman patently and unambiguously lacked subject matter jurisdiction to adjudicate the underlying case, styled,Andrea Barnes v. University Hospitals of Cleveland, et al., Cuyahoga County Common Pleas Court, Case No. CV 01 455448 (hereinafter, "Barnes"), including the motion of Lexington Insurance Company to intervene (hereinafter, "motion to intervene").
III. Lexington is entitled to de novo review of the denial of its motion to intervene in post trial proceedings.
[1] Appellate Case Nos. 87247 and 87946 were filed by defendant MedLink of Ohio; Appellate Case Nos. 87285 and 87903 were filed by plaintiff Andrea Barnes; and Appellate Case No. 87710 was filed by intervenor Lexington Insurance Co.
[2]All assignments of error are included in Appendix A of this Opinion by case number.
[3]Case No. 87247-MedLink's appeal:
"I. The jury' s verdict was a product of passion and prejudice and was so overwhelmingly disproportionate as to shock reasonable sensibilities."
"V. The judgment is against the weight of the evidence."
[4]Case No. 87247-MedLink's appeal:
"II. The judgment is contrary to the law on punitive damages and violates appellant' s constitutional rights."
"III. Reversible errors of law occurred at trial and were not corrected by the trial court."
"IV. The trial court erred in denying appellant' s motion to separate plaintiff' s claim for punitive damages."
[5]Case No. 87247-MedLink's appeal:
"VI. The trial court erred in its award and calculation of attorney' s fees."
Case No. 87247-Barnes' cross-appeal; also, Case No. 87285-Barnes' appeal, assignment I:
"VIII. The trial judge abused his discretion by failing to consider and (sic) award attorney fees based upon the contingency agreement that had been entered with the client."
[6]Case No. 87710-Lexington's appeal:
"I. Lexington Insurance Company ("Lexington") is entitled to intervention of right to oppose the motion for prejudgment interest filed by plaintiff, Andrea Barnes."
"III. Lexington is entitled to de novo review of the denial of its motion to intervene in post trial proceedings."
[7]Case No. 87247-MedLink's appeal:
"VII. Judge Glickman did not have subject matter jurisdiction to hear this case."
Case No. 87903-MedLink's cross-appeal:
"IV. Judge Glickman did not have subject matter jurisdiction to hear this case."
Case No. 87710-Lexington's appeal:
"II. Judge Robert T. Glickman patently and unambiguously lacked subject matter jurisdiction to adjudicate the underlying case * * *."
[8]Case No. 87903-Barnes' appeal:
"I. The trial judge misconstrued the applicable privilege and unjustifiably refused to allow plaintiff-appellants to discover reports and information that defendant-appellees had obtained prior to trial that were necessary to contest their defense to pre-judgment interest."
"II. The trial judge erred, as a matter of law, by calculating the award of pre-judgment interest from the date the complaint was filed, December 4, 2001, instead of the date the case (sic) of action accrued, October 19, 2000."
"III. The trial judge erred, as a matter of law, in failing to include the award of attorney's fees in the calculation of pre-judgment interest."
Case No. 97946-MedLink's appeal:
"I. The trial court erred in awarding prejudgment interest to plaintiff."